**COMMISSIONER OF INTERNAL REVENUE, Petitioner,**

v.

**Thompson I. WELCH, Individually, et al., Respondents.**

**Thompson I. WELCH, Individually, et al., Respondents**

v.

**COMMISSIONER OF INTERNAL REVENUE.**

No. 20819.

United States Court of Appeals
Fifth Circuit.

June 1, 1965.

Carolyn R. Just, Atty., Dept. of Justice, Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Gilbert E. Andrews, Attys., Dept. of Justice, R. P. Hertzog, Act. Asst. Chief Counsel, I.R.S., Robert B. Alexander, Jr., Atty., I.R.S., Washington, D. C., for petitioner.

Robert E. Davis, Wentworth T. Durant, Ronald M. Mankoff, Dallas, Tex., for respondents.

Before BROWN and WISDOM, Circuit Judges, and ESTES, District Judge.

JOHN R. BROWN, Circuit Judge.

This case is not so much the problem of who did what to whom. Rather, it is who really did the act and when. This simplification is beguiling, however, for specifically involved is the right of the Commissioner to make pre-1954 adjustments occasioned by 1957–1958 changes in the Taxpayer's method of accounting pursuant to § 481,[1] a statutory structure with a laudable aim but with inescapably built-in difficulties.[2] Cf. Graff Chevrolet Co. v. Campbell, 5 Cir., 1965, 343 F.2d 568 [No. 21178, March 29, 1965].

The Tax Court held that the change was initiated by the Taxpayers[3] through the instrumentality of their 1957 returns, timely filed in 1958. Finding also that the change was made without consent of the Commissioner,[4] the Court approved the Commissioner's conclusion that adjustments were required to avoid exclusion of income. At issue here is the correctness of including in the adjustments those relating to pre-1954 inventories and accounts receivable. On Taxpayer's appeal we reverse this holding and remand the case for further consistent proceedings including consideration of the proper post-1954 adjustments sought by the Government's protective inconsistent deficiency notice and appeal.[5]

---

1. 26 U.S.C.A. § 481; as amended by § 29, Technical Amendments Act of 1958, P.L. 85–866, 72 Stat. 1606.

2. One has noted with a mixture of despair and hope: "It must often be said of the Internal Revenue Code of 1954, that of all the good intentions with which the road to hell is paved, this represents the best. Certainly the intention of Section 481 to codify case law and administrative interpretation is a pavement block all its own. Hopefully, the courts will offer judicial arbitration of interpretations of the statute in the near future. In the meantime, we must live with codified confusion instead of uncodified chaos." Fletcher, Section 481: Changes in Accounting Methods, 1960 N.Y.U. 18th Annual Institute on Federal Taxation 161 [hereafter cited as Fletcher].

3. Taxpayers are Thompson and his father, T. I. Welch (and their respective wives), each of whom owned a 50% interest in Welch Grain Company, a partnership engaged in the business of storing wheat and milo in its grain elevator at Dalhart, Texas, and in the operation of a feed mill.

4. Int.Rev.Code of 1954, § 446(e); 2 Mertens, Law of Federal Income Taxation § 12.19 (hereafter cited as Mertens).

5. See note 30 as to this second deficiency; also notes 17, 27, 40, infra.

As recognized by the joint stipulation and motion of the parties, the question of overassessments to whatever extent they are or will be pertinent is likewise open.

A capsulated discussion of the statutory-decisional background simplifies consideration of the facts.

■ It starts with the principle that taxable income is to be computed under the method of accounting on the basis of which a taxpayer regularly computes his income in keeping his books.[6] Prior to the enactment of the 1954 Code, the Commissioner was left to administrative practices to compel adjustments to prevent the omission of income or duplication of deductions occasioned by change in the method of accounting by a taxpayer. The problem could arise in at least three situations, (a) where a taxpayer sought consent to change a method of accounting, (b) where the Commissioner compelled a change, and (c) where a taxpayer made change without the Commissioner's consent. Not surprisingly there was neither consistency nor uniformity in court treatment of these administrative practices.[7] After considerable tergiversations, uniformity did emerge that when the Commissioner compelled the change in the method of accounting, adjustments could not be required as to prior years. By § 481 the 1954 Code expressed the legislative policy that no item should be omitted and no item should be duplicated as a result of a change in a method of accounting or reporting income for taxation. The provisions were to apply both in the case where the taxpayer voluntarily changes his accounting method with the consent of the Commissioner and also in the case where a change in method is required by the Commissioner. 2 Mertens, § 12.21. But as originally enacted, § 481 literally forbade adjustments with respect to a taxable year to which the 1954 Code did not apply without regard to *who* initiated the change.[8] The Code had scarcely been engrossed and the ceremonial pens passed out when the taxing authorities recognized the likely existence of a large, not a loop, hole.[9] To avoid such unintended and irrational windfalls, Congress enacted the Technical Amendments Act of 1958 (see note 1, supra). To the exception in § 481(a) (2), see note 8, supra, the italicized words were added to read as follows:

"[E]xcept there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply *unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.*"

The magic word is, of course, "initiated". The legislative history illumines the amendatory clause and reflects a congressional purpose to treat the word both broadly and specifically. Thus, the House Report, taking cognizance of the change wrought by § 481 as originally enacted that, without regard to the party

6. See Int.Rev.Code of 1954, § 446(a); and to the same effect, Int.Rev.Code of 1939, § 41.

7. See Fowler Bros. & Cox, Inc. v. Commissioner of Internal Revenue, 6 Cir., 1943, 138 F.2d 774; Ross v. Commissioner of Internal Revenue, 1 Cir., 1948, 169 F.2d 483, 7 A.L.R.2d 719; Goodrich v. Commissioner of Internal Revenue, 8 Cir., 1957, 243 F.2d 686; 2 Mertens, §§ 12.21, 12.21a; Yager, The Dilemma Under Section 481, 1958, 16th Annual NYU Institute on Federal Tax 565, 566 [hereafter cited as Yager]; Barnes, Changes in Accounting Methods, 1962, 11th Annual Tulane Tax Institute 470, 473; Fletcher, supra, note 2, at 162.

8. "[T]here shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment with respect to any taxable year to which this section does not apply." § 481(a) (2).

9. Apparently tax touts publicized this in tipster sheets. See, Miller, Tax Problems in Change of Accounting Methods, 1957, 9th Tax Institute Univ.So.Calif., 353. Initiating efforts for legislative changes, the Service by prolonged "sit-in" declined to give consent to requested changes. See Yager, supra, note 7, at 568, 573, 574; Barnes, supra, note 7, at 474; Fletcher, supra, note 2, at 167; 2 Rabkin & Johnson, Federal Income, Gift and Estate Taxation § 12.02(10).

setting them in motion "no adjustments are required which are attributable to years before the application of the 1954 Code," declared that the Committee could see "no reason why the pre-1954 Code year adjustments should not be made, when taxpayers, of their own *volition,* have changed their method of accounting * * * [this being] generally the practice under the 1939 Code." [10] The same idea was put forward in the Senate Committee Report which concluded that "pre-1954 Code year adjustments should be made where taxpayers of *their own accord* changed their method of accounting." [11] (Emphasis supplied) The report then pinpoints it in terms of action occasioned by examination by a Revenue Agent: "A change in the taxpayer's method of accounting required by a revenue agent upon examination of the taxpayer's return would not, however, be considered as initiated by the taxpayer." [12] And the regulations purport to paraphrase these approaches. [13]

▆▆▆▆ Several things bear emphasis. Foremost, § 481(a) (2) still imposes a condition on pre-1954 adjustments. The condition is that the change in the method of accounting giving rise to the neces-

sity for the adjustment be "initiated by the taxpayer." If, therefore, the change is not initiated by the taxpayer, it matters little who else might have done it or the governmental authority of such person for such act. In other words, as a logical-legal matter generally, demonstration of the negative is not proof of the positive. Thus the mere showing (or finding) that the examining Revenue Agent affirmatively lacked the power to bind the Commissioner, i. e., lacked power to "initiate", is not a sufficient basis for concluding the opposite—that it was the Taxpayer who "initiated" the change. Metaphysics cannot be carried that far that fast. Formidable as is the presumptive correctness of the Commissioner's implied finding, the record must finally show a factual basis for it. See Phillip's Estate v. Commissioner of Internal Revenue, 5 Cir., 1957, 246 F.2d 209, 214. [14] Next, whether the change was taxpayer initiated is essentially a question of fact with § 7482(a) bringing into play the clearly erroneous concept of F.R.Civ.P. 52(a) which includes countervailing inferences from uncontradicted facts, Commissioner of Internal Revenue v. Duberstein, 1960, 363 U.S. 278,

10. H.Rep.No.775, 85th Cong., 2d Sess. pp. 19–20 U.S.Code Congressional and Administrative News, p. 4791 (1958–3 Cum.Bull. 811, 830).

11. S.Rep.No.1983, 85th Cong., 2d Sess. (1958–3 Cum.Bull. 922, 966). Similar statements are found "adjustments * * * under the House bill generally are to be spread forward * * * if the change is voluntary * * *." Or where changes are made by taxpayers "of their own volition." 1958–3 Cum.Bull. at 927.

12. H.Rep.775, (1958–3 Cum.Bull. at 830) identical with S.Rep.1983 (1958–3 Cum. Bull. at 966).

13. See, e. g., Treas.Reg. § 1.481–1(c) (2) (i); "If the change in method of accounting is voluntary (that is, initiated by the taxpayer),"
  "(ii) The portion of the adjustments arising from a voluntary change in method of accounting * * *"

"(3) If the change in method of accounting is not voluntary (that is, not initiated by the taxpayer), * * *"
  "(5) A change in the taxpayer's method of accounting required as a result of an examination of the taxpayer's income tax return will not be considered as initiated by the taxpayer. On the other hand, a taxpayer who, on his own initiative, changes his method of accounting in order to conform to the requirements of any Federal income tax regulation or ruling shall not, merely because of such fact, be considered to have made an involuntary change."

14. In other words, despite the double insulation arising from the Commissioner's implied finding and the clearly erroneous concept of its being sustained by the Tax Court, the taxpayer is not met with establishing this succession of negatives: the record does not show that the change was not initiated by the Revenue Agent.

80 S.Ct. 1190, 4 L.Ed.2d 1218. But United States v. United States Gypsum Co., 1947, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746, 766, and our many cases following it [15] leave the Court with the responsibility of reversing such findings upon judicially determining that the result is contrary to the truth and right of the case. Finally, for our present purpose, reviewing a fact finding of the Tax Court, reviewing courts recognize that the fact finder may distinguish between a positive "requirement" and a mere "suggestion" made by a revenue agent to a taxpayer whose return is being examined. Falk v. Commissioner of Internal Revenue, 37 T.C. 1078, affirmed 5 Cir., 1964, 332 F.2d 922; Brookshire v. Commissioner of Internal Revenue, 1959, 31 T.C. 1157, affirmed, 4 Cir., 1960, 273 F.2d 638, cert. denied, 363 U.S. 827, 80 S.Ct. 1597, 4 L.Ed.2d 1523.

This brings us to the facts which, although largely uncontradicted, are hardly simple in revealing the undulating process through which the Commissioner, personifying the whole Revenue Service establishment, finally arrives at the determination carrying presumptive correctness.

Welch Grain Company, the partnership, up to 1957 maintained its books and records and reported its income on the cash method. It reported its cash receipts as income and its expenses as deductible when paid. Although it had records showing the precise status of inventories of grain on hand in determining or reporting income for tax purposes, inventories [16] were not used nor was account taken of accounts receivable.

In 1956 began a series of revenue agent examinations which did not terminate until 1959. The first was by Agent Martin who examined returns for 1953 and 1954 of one of the Taxpayers. He advised Taxpayers that the books of the partnership were in good shape and no adjustments were proposed.

Next came the examination of Agent Black in 1957. This examination covered the returns, books and records of the Taxpayers and the partnership for the years 1954, 1955 and 1956. The testimony was uncontradicted that Agent Black arrived from the Dallas office with the announced purpose of changing the Company from a cash to an accrual or inventory method. And he did just that. During his examination, Agent Black was preoccupied with inventory problems, records and data. At the conclusion of his examination, he filed a Revenue Agent's Report, corroborated completely by his later court testimony, in which he computed income for the Grain Company on the basis of inventories. In reconstructing the income statement, Agent Black allowed no opening inventory for 1954 and estimated closing inventories for 1954, 1955 and 1956 by spreading back the 1956 closing inventory over each of those years in approximately equal thirds. On the basis of these inventory adjustments and without inclusion of any amount for accounts

---

15. Sanders v. Leach, 5 Cir., 1946, 158 F.2d 486, 487; Bishop v. United States, 5 Cir., 1959, 266 F.2d 657, 666; Gounares Bros. & Co. v. United States, 5 Cir., 1961, 292 F.2d 79, 81; W. R. B. Corp. v. Geer, 5 Cir., 1963, 313 F.2d 750, 753.

16. On occasion grain was purchased by the Company with borrowed money secured by negotiable warehouse receipts. The Company regarded this grain as belonging to the bank. As inclusion of the purchase cost would have increased deductions and hence decreased (or eliminated) taxable income, Taxpayers thought this would be a distortion and excluded this grain from purchases until the loan was repaid and the warehouse receipts redeemed. To the extent followed, one Agent regarded this as a modified, rustic, partial inventory.

receivable (or increases therein),[17] Agent Black's report resulted in an increase in Grain Company income of $66,137.22. Despite some likely internal errors in the adjustments (see note 17, supra) Agent Black's report made it plain that, carrying out his announced purpose, he had changed over from cash to accrual-inventory accounting. On the form "explanation of items," his report stated: "Where inventories are an income determining factor, it becomes necessary that such be considered in determining cost of sales * * *. Inclusion of inventories in the computation of cost of sales is necessary where such represents an income determining factor." "Inventories were not used in computing costs of sales. The inclusion of inventories necessary as such is an income determining factor in this type of business." [18]

And before he left town, Agent Black nailed down what he came to do. He prepared for each of the two sets of Taxpayers on Form 870 a Waiver of Restrictions on assessment and collection,[19] and simultaneously prepared and obtained a signature of a partner of the Grain Company on Form 875.[20] On this form the partner, after reciting that he had "reviewed the recommendation covering an investigation of [the partnership's] return(s) of income, which discloses a change in income and in the distribution of the total income as corrected," then declared on behalf of the partnership that the " * * * findings of the examining officer was hereby ac-

---

17. It is not clear why the inventory estimates were used and accounts receivables not noted at all. Grain storage records and other data showed these stipulated figures at the year endings:

| | (a) 12-31-53 | (b) 12-31-54 | (c) 12-31-55 | (d) 12-31-56 |
|---|---|---|---|---|
| Grain | $61,320.23 | $80,911.85 | $138,510.54 | $104,105.00 |
| Receivables | 8,161.84 | 16,229.60 | 27,820.41 | 35,670.17 |

The difference between the estimated and actual inventory figures and the omission of account receivables is presumably the principal subject of the Governor's protective inconsistent deficiency notice and appeal which is now open for reconsideration on the remand. See notes 4, supra, and 27, 30, 40 infra.

---

18. Of course he was on sound ground. "In all cases in which the production, purchase, or sale of merchandise of any kind is an income-producing factor, merchandise on hand * * * at the beginning and end of the year shall be taken into account in computing the taxable income of the year." Treas.Reg. § 1.446–1(a) (4) (i); 2 Rabkin & Johnson, Federal Income, Gift and Estate Taxation § 12.02(13).

19. These were on Form 870 (Rev.Aug. 1954), "Waiver of Restrictions on Assessment and Collection of Deficiency in Tax and Acceptance of Overassessment." In the tabular spaces under deficiencies it listed the tax, the penalties, and totals for each of the years 1954, 1955 and 1956. Unlike Form 870–AD in which the taxpayer "offers to waive the restrictions * * * and to consent to the assessment and collection of * * * deficiencies * * * ", the offer being

" * * * subject to acceptance by or on behalf of the Commissioner * * *," Form 870 is unconditional. It prescribes: "Pursuant to section 6213(d) of the * * * Code of 1954 * * *, the restrictions provided in section 6213(a) * * * are hereby waived and consent is given to the assessment and collection of the following deficiencies * * * with interest * * *." Of course, as the Note on the form reflects, "it is not * * * a final closing agreement under section 7121 * * * and does not, therefore, preclude the assertion of a deficiency or a further deficiency * * * should it subsequently be determined that additional tax is due * * *."

20. Form 875 (Rev.Jan.1955) "Acceptance of Examining Officer's Findings by a Partnership or Fiduciary." In tabular columns a specified dollar increase in "amount of income" was shown for each of the years 1954–55–56.

cepted." Although, as later pointed out (note 39, infra), aggressive attitudes on the Agent's part are not too significant. Taxpayer Thompson I. Welch characterized the circumstances under which he signed the forms as "pressure" by Agent Black. He testified that although, when Agent Black first tendered the forms for signature, he demurred with an expressed desire to consult someone, Agent Black told him that it "would be best to sign" and "if [he] didn't sign [Agent Black] could have all of that inventory put into one year." [21] Finally, the Agent's consistent purpose to put this business on an accounting-inventory basis was made quite clear in an irrefutable way. At the close of the examination, Agent Black told Thompson Welch, "that he should include his full inventory in his return in both the profit and loss and balance sheet." In addition he gave to Taxpayer two handwritten tabulated work sheets one [22] of which was headed up:

"Erwin Welch. Give this to your accountant for 1957 returns."

Immediately below this were figures for inventories as of January 1, 1957. [23]

Although it breaks the sequence of the successive Revenue Agent examination, it is both significant and in keeping with chronology to here point out that action of the Government did not end—nor was it intended to—with Agent Black's RAR and the executed forms 870 and 875. On the contrary, decisive action was taken by persons acting strictly in accordance with their authority. The official Certificates of Assessments and Payments [24] show that on the basis of Agent Black's report, dated July 22, 1957, and the 870 waivers, signed July 12, 1957, the audit deficiencies therein prescribed were assessed on September 30, 1957. [25] After receipt from the Amarillo Collection Officer of either the first or delinquent account notice, see note 25, supra, the Taxpayers for the first time consulted a certified public accountant, and a conference was convoked with Collection Officer Pierce. Accepting Agent Black's accrual-inventory approach, Taxpayer's

---

21. In cross examination by Government counsel, Agent Black did deny that he "did * * * in any way say or do anything to pressure [Taxpayers] to sign the forms 875 and 870." The denial of lumping inventory in one year was only in terms of pre-1954 adjustments:

"Q. Did you tell them that if they did not sign you would pick up all of the pre-1954 adjustments and make them pay taxes on them?

"A. No, sir. I would have had the other years."

22. The other was a breakdown as to each of the Taxpayers stating the same figures as appeared on the two Forms 870.

23. It was in this form:
"Welch Grain Co.

| Inventories 1/1/57 | Grain | $ 99,605.00 |
| | Feed | 4,500.00 |
| | Total | $104,105.00" |

This figure of $104,105.00 was the precise amount listed on Exhibit "A" to his RAR for inventory, end of year 1956. See also Col. (d), note 17, supra.

24. Form 899 (Rev. 1–58), appearing as an exhibit with covering Request for Transcript of Account (Form 899 Rev. 1–58).

25. The following excerpt of entries for Thompson I. Welch and wife for the year 1955 is typical.

| Taxable Period (a) | Received or Scheduled Date (c) | Description (d) | Liability And (Abatement) (e) | Payments and Credits Applied (f) | Balance (g) | Supplemental Information (i) |
|---|---|---|---|---|---|---|
| 1955 | 2–14–56 | Full-paid return | 2,109.82 | 2,109.82 pd. | 0 | |
| 1955 Addl. | | Audit deficiency: Tax | 3,473.25 | | | Assessed 9-30-57 First notice 9-30-57 Delinquent account issued 10-29-57 |
| | | Int. to 8–11–57 | 275.91 | | | |
| | | Penalty | 37.61 | | | |
| | 12–10–57 | Payment | | 1,779.93 | 2,006.84 | |

CPA urged that erroneous inventory figures were used since Agent Black had failed to allow a proper opening inventory for 1954 and had failed to include accounts receivable. The Collection Officer suggested that these adjustments and the corrected tax based thereon be handled by amended returns and payments within thirty days.[26] This was done.[27]

Consistent with the instruction in Agent Black's handwritten memo (note 23, supra), the partnership information return for 1957 was filed in June 1958 using the specified opening inventory plus purchases and ending inventory. Later that year, in October 1958, the partnership returns for 1954, 1955 and 1956 were again re-examined, this time by Agent Leidiker. Accepting the inventory adjustments made by Agent Black's RAR and a resulting no change for 1954, Agent Leidiker increased partnership income by $35,670.17 by inclusion of accounts receivable.[28] The report concluded, "All other items have been examined and adjusted in prior [Black's] audit— no further examination was made."

But it was not yet over. Twenty-five months after Agent Black's examination and the execution of Forms 870 and 875 and fourteen months after Agent Leidiker's acceptance of, and adjustment to, Black's report, Agent Culberson in December 1959 made a re-examination which undid the whole thing.[29] Agent Culberson reversed Agent Black's earlier inventory adjustments, ignored those of Leidiker and then computed the partnership's income under § 481 on the assumption that Taxpayers had initiated a change in the partnership's method of accounting. Treating the partnership as being on the cash basis for those years, he proposed overassessments of income tax for 1954, 1955 and 1956. Proposing a substantial deficiency for 1957, the report stated, "The principal cause of change is due to correction of the prior Revenue Agent's Report and computation of income under sec. 481 * * * when taxpayer changed his method of accounting in 1957" without consent of the Commissioner. On June 13, 1960, by statutory notices of deficiency, the Commissioner put his imprimatur on the finding that the method of accounting had been changed by the partnership during 1957 "without securing permis-

---

26. We make no intimation that the Collection Officer's suggestion or acquiescence operated to amend Agent Black's RAR and the deficiencies specified.

27. Amended returns for 1954–55–56 (filed December 31, 1957) reduced partnership income as fixed by Black's RAR by approximately $32,000. Income was increased by $27,000 and decreased by inventory adjustments for each of the three years by spreading over the beginning January 1, 1954 inventory ($61,320.23,

| 28. | Year | | |
|---|---|---|---|
| | 1954 | $ 0 | |
| | 1955 | 27,820.41 | [see Col. (c), note 17, supra] |
| | 1956 | 7,849.76 | [see Col. (d), minus Col. (c), note 17, supra] |
| | Total increase in income | $35,670.17 | |

see Col. (a) note 17, supra) equally over the three years.

As the assessment record (Form 899, see note 25, supra) reflects, substantial partial payments on the audited deficiency were made December 10, 1957, leaving balances due and now presumably subject to readjustment on remand to the extent that they are the subject of timely claims, protective deficiency notices, cross appeal, stipulated overassessments, etc. See notes 5, 17, supra, and 30, 40, infra.

29. No disparagement of this ceaseless re-examination is intended. Indeed, Agent Culberson's report indicates it might have been an unintended, if not unexpected, result of the Taxpayers' efforts to adjust downward Agent Black's adjustment.

sion to change as required under Section 446(e) of the" Code.[30]

■ This recitation leaves us with the conviction that none of the changes in accounting methods can really be characterized as one "voluntarily" made by Taxpayers "on their own accord." Consequently, the record fails to sustain the essential element that they were taxpayer-initiated. The contrary finding of the Tax Court is clearly erroneous and cannot stand.

The record is uncontradicted that everything done was occasioned by Agent Black's examination in 1957. Up to that time it is undisputed that these Taxpayers, acting in unchallenged good faith, were totally ignorant of their mistaken bookkeeping and income tax reporting methods. Light dawned with Agent Black's arrival. Agent Black, energetically and conscientiously performing his duty, came with the announced purpose of having the partnership change from cash to an accrual-inventory basis. True to his word and, more important, true to regulations binding on taxpayers and agents alike, he stated orally and in writing that for this character of business, the law required the use of inventories as a basis of determining true income for tax purposes. Advice alone to that effect might well have made his observations nothing more that the mere "suggestion" which we held the Tax Court entitled to find in Falk v. Commissioner, 5 Cir., 1964, 332 F.2d 922.

■ But it did not stop there, nor did Agent Black intend for it to stop. Recognizing fully—just as Form 870 declares—that a waiver of restrictions on immediate assessment and collection does not foreclose further action by the Commissioner and the assertion of deficiency notices of the very kind later issued here (see note 24 and accompanying text, supra), an agent making a field audit may properly propose execution of Form 870 for the purpose of securing agreement by the Taxpayer to the proposed changes and the immediate assessment and collection of the tax without the delays called for by a formal deficiency notice. Its use is permitted. And its use by an agent in a field audit is certainly authorized.[31] All such efforts are officially encouraged. 9 Mertens, Cum.Supp. § 49.115; Rev.Proc. 63–5, 1963–1 Cum.Bull. 484.

■ Moreover, when Form 870 is used, it is effective when signed by the taxpayer without any signature by the Commissioner. 9 Mertens, § 49.12. It is an express unconditional waiver and it is expected that the additional taxes will be assessed, just as they were here.[32] 9 Mertens, § 49.139. The amount of underpaid taxes satisfies the statutory definition of a "deficiency", § 6211; Treas. Reg. § 301.6211–1; 9 Mertens, § 49.128, and the District Director through the Collection Officer makes as valid an assessment[33] on the basis of it as is

30. The third notice of deficiency, May 24, 1961, covers the years 1958 and 1959 by reason of the ten-year spread-forward.

A second deficiency issued May 19, 1961, is the inconsistent protective notice for the years 1955 and 1956, the subject of the Government's appeal and now open for reconsideration on remand. See notes 5, 17, 27, supra, and 40, infra.

31. See 9 Mertens, §§ 49.110, 115; Int. Rev.Code § 6213(d); Treas.Reg. § 301.-6213–1(d), taxpayer may waive by filing signed notice with District Director "or other authorized official under whose ju-

risdiction the audit * * * of the return * * * is being conducted."

32. In no sense was, or could this be, the case of a runaway agent charging off singlehanded, see note 37, infra. The assessment was not made until September 30, 1957, more than 60 days after submission by Agent Black.

33. Assessments are required by § 6201. Treas.Reg. § 301.6201–1(a) delegates this duty to the District Director who in turn appoints assessment officers, § 301.6203–1, who assess by signing the supporting list or record, the date of signing being the date of assessment. 9 Mertens, § 49.81, Cum.Supp. p. 6; see

done by the receipt of a taxpayer's return or the issuance of a formal deficiency notice.[34] Moreover, as a consequence of the issuance and acceptance of Form 870, official action—manifested in the most spectacular form for one charged with the duty of collecting money thereby—takes place. It results in the assessment and collection (wholly or partially) of the tax.[35] This means that the action of the auditing Revenue Agent has been adopted by the District Director through his subordinates, even though tentatively in the sense that subsequent assessments may still be made.[36] Thus in this situation there is no basis for the apprehensions expressed by the dissenter in United States v. Lindner, 10 Cir., 1962, 307 F.2d 262, 266, nor that of the Government [37] that "a change * * * of accounting required by a revenue agent * * *" is satisfied only when the change is accomplished by the issuance of a formal deficiency notice by the District Director.[38]

By every act done by Agent Black and adopted by his superiors to the extent of assessing and collecting addi-

tional taxes, it is simply beyond belief to say that these Taxpayers set this business in motion. There was nothing they did voluntarily or of their own accord. Everything they did they were required to do by an agent whose actions were authorized. Indeed, we think that Congress, in articulating the test in terms of a "change * * * required by a revenue agent upon examination," had in mind this very situation of a conscientious Agent properly utilizing the machinery for determination, imposition and collection of added taxes.[39] The whole record permits but one conclusion: the change made by the Taxpayer in the method of accounting and computing and reporting income taxes was "required by a revenue agent upon examination of the taxpayer's return * * *." Congress, which withdrew the absolute cutoff in 1958, could lay down the condition. The condition was intentional. The cutoff remains. The deficiency notices insofar as they make pre-1954 adjustments cannot stand.

The effect of our holding, however, is to sustain the Government's protective appeal for reconsideration on remand of

---

notes 24, 25, and 27, supra, as to assessments here. The assessment sets the collection machinery in motion. 9 Merttens, § 49.186; Int.Rev.Code § 6303(a).

34. United States v. Price, 1959, 361 U.S. 304, 80 S.Ct. 326, 4 L.Ed.2d 334, dealing with the 1939 Code, dispels all doubt. Of course under § 6213(d), the 1954 Code expressly provides that the "taxpayer [may] at any time * * * by a signed notice in writing filed with the [district director] * * * waive the restrictions * * * on the assessment and collection of the whole or any part of the deficiency." 9 Mertens, § 49.140.

35. Payments made, see notes 25, 27, supra, were assessable upon payment with or without waiver. § 6213(b) (3); Treas.Reg. § 301.6213–1(b) (3).

36. Treas.Reg. § 301.6213–1(d): "After such waiver has been acted upon by the district director and the assessment has been made in accordance with its terms, the waiver cannot be withdrawn." We are not here concerned with problems of estoppel. See Daugette v. Patterson, 5 Cir., 1957, 250 F.2d 753, cert. den.,

1958, 356 U.S. 902, 78 S.Ct. 561, 2 L. Ed.2d 580 (Form 870–AD); 4 Mertens, § 49.139.

37. See note 6 of the 10 Circuit's opinion, 307 F.2d at 265. This is its theme here also.

38. While we reject the Government's flat contention that nothing short of a formal deficiency notice meets the test of a "change * * * required by a revenue agent upon examination", we need not decide how much less than that done here would suffice. For reasons pointed out, the basic premise of the Government's thesis—deficiencies are ascertainable, fixed and enforced only by formal deficiency notice—is unsupported by the legislative, regulatory and administrative structure.

39. We reject the idea that Congress was thinking in terms of coercive, threatening, personal statements, mannerisms or actions of Revenue Agents. Congress is bound to have approached it on the assumption that the manner of performance by agents would be proper, legal and free from coercive threats.

the question of deficiencies for 1955, 1956.[40]

At this stage, it is now determined for all practical purposes that it was the Commissioner who required the adjustments. Obviously under § 446(b) the Commissioner could properly determine that "the method used [by the Taxpayers] does not clearly reflect income" and then conclude that "the computation of taxable income" should "be made under" a traditional accrual-inventory method in order to "clearly reflect income." That brought into play § 481(a). Under it the Commissioner, regardless of who—taxpayer or Commissioner—makes the change, is required to take "into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, * * *." The only limitation on those adjustments is that no pre-1954 adjustments shall be made. For obvious reasons we do not begin to make even so much as a faint whisper of a possible suggestion as to the timeliness, or merits of the asserted deficiency for the years 1955–1956, the effect of the assessments pursuant to Forms 870 or any other matters. All of these, whether mentioned or not, are for consideration by the Tax Court on remand. The only restraint imposed by our mandate is that the Tax Court's adjudication be consistent with the basic holding that the changes instituted in 1957 were instigated by the Commissioner and not initiated by the Taxpayers.

Reversed and remanded.

---

**40.** See second deficiency, note 30, supra.