**SICULA OCEANICA, S.A., Appellant,**

v.

**WILMAR MARINE ENGINEERING & SALES CORPORATION, Appellee.**

**No. 26106.**

United States Court of Appeals
Fifth Circuit.

July 7, 1969.

Alfred M. Farrell, Jr., Benjamin W. Yancey, New Orleans, La., for appellant; Terriberry, Rault, Carroll, Yancey & Farrell, New Orleans, La., of counsel.

Henry J. Read, New Orleans, La., for appellee; Montgomery, Barnett, Brown & Read, New Orleans, La., of counsel.

Before WISDOM, THORNBERRY, and GOLDBERG, Circuit Judges.

WISDOM, Circuit Judge:

 This action in admiralty was tried without a jury and was submitted to the district court entirely on depositions and documents.[1] The appellant's burden, under Fed.R.Civ.P. 52(a), of showing that the trial judge's findings of fact are "clearly erroneous" is not as heavy, therefore, as it would be if the case had turned on the credibility of witnesses appearing before the trial judge. Galena Oaks Corp. v. Scofield, 5 Cir. 1954, 218 F.2d 217. Caradelis v. Refineria Panama, S.A., 5 Cir. 1967, 384 F.2d 589.[2] However, regardless of the

1. At the pre-trial conference the busy trial judge allocated one day for the trial of the cause. A letter written jointly by counsel for the parties states: "Because of the nature and extent of the difficulty in arranging for the availability of witnesses from abroad, counsel concluded that the matter could be presented to the Court most expeditiously by taking all testimony by deposition before trial. * * *"

2. See also Mitchell v. Raines, 5 Cir. 1956, 238 F.2d 186; Mayo v. Pioneer Bank

documentary nature of the evidence and the process of drawing inferences from undisputed facts, the reviewing court must apply the "clearly erroneous" test. 2B Barron & Holtzoff (Wright ed.) § 1132 p. 523; § 1133; McAllister v. United States, 1954, 348 U.S. 19, 75 S. Ct. 6, 99 L.Ed. 20. We have gone over the record word by word. We are "left with the definite and firm conviction that a mistake has been made". United States v. United States Gypsum Co., 1948, 333 U.S. 364, 68 S.Ct. 525, 92 L. Ed. 746.

The dispute between the parties arose as a result of a written contract dated April 7, 1965, between Wilmar Engineering & Sales Corporation, represented by Raymond G. Willhoft, Secretary-Treasurer of the company, and Sicula Oceanica, S.A. (Siosa), represented by Dr. Aldo Grimaldi, General Agent and part owner of Siosa.[3] The contract obligated Wilmar to clean the tanks of the M/V Perseo by April 13, 1965, for "the maximum price of $31,000". The vessel, which had been carrying oil, had to be clean for the carriage of grain "to the satisfaction of inspectors of the National Cargo Bureau and the Board of Trade".[4] The inspectors "rejected" the vessel on several occasions but finally "passed" it on April 27, 1965. Wilmar's men had worked on the tanks until April 25, when the Perseo's master refused to allow them to come aboard. Wilmar sued Siosa for $62,690.88, the balance allegedly due as costs for cleaning the tanks. Siosa counter-claimed for damages of $51,045.91 for breach of contract and breach of the warranty of workmanlike performance. The district court denied the counterclaim and awarded Wilmar $46,776.41.

The district court held that the written contract was voidable because it was "based upon a mutual mistake of fact concerning the condition of the tanks". The court found:

When the contract was entered into Wilmar, through its representative, Willhoft was given to understand that the vessel had been completely butterworthed[5] and that nothing re-

& Trust Co., 5 Cir. 1961, 297 F.2d 392; C.I.R. v. Welch, 5 Cir. 1965, 345 F.2d 939; Frazier v. Alabama Motor Club, 5 Cir., 1965, 349 F.2d 456; International Minerals & Chemical Corp. v. Moore, 5 Cir. 1966, 361 F.2d 849.

3. "April 7, 1965
 We propose to clean M/T PERSEO to load a cargo of corn. We will clean center tanks #1–9 and port and starboard tanks 1–9 to be cleaned to the satisfaction of the National Cargo Bureau and the Board of Trade Inspectors.
 Work will be performed at the regular rate of $4.20 per man hour. Work will probably be completed by Monday night midnight April 12th. Anyway vessel must be in Baton Rouge by 12 noon on April 13th. Normal overtime rate will be charged if necessary.
 *Terms:* 75% of invoice to be paid on securing of certificate of readiness from National Cargo Bureau and Board of Trade Inspectors.
 Maximum price for cleaning vessel will be $31,000 (Thirty one thousand dollars).
 /s/ Aldo Grimaldi
 /s/ Raymond Willhoft
 Wilmar Marine Engineering"

4. The National Cargo Bureau is a nonprofit agency of the United States Coast Guard. Its surveyor at Baton Rouge, Captain Norman G. Battcock, testified that the Bureau is "concerned with safety of life at sea, carriage of goods and storage of same, cleanliness of ships for both bulks and perishables—flour, grain".
 In Baton Rouge inspectors for the Port Commission perform the same function that inspectors for the New Orleans Board of Trade perform.

5. Every tank has a number of butterworth doors through which the butterworth machines pump boiling salt water under pressure, then inject hot fresh water and chemical products into the tanks. This process leaves residues that form a sediment in the bottoms of the tanks which is removed by compressed air and buckets. The final step consists of spraying chemical products in those parts of the tanks that are not completely clean and wiping the tanks with hemp and rags.

mained to be done but to clean out the residue left after butterworthing had been completed. Wilmar was not advised of the fact that the butterworthing had not, in fact, been completed and that much more than a "clean-up" job was involved. * * * Neither Wilmar nor Grimaldi were aware of the fact that the tanks had not been properly butterworthed and that instead of petroleum residues remaining merely at or near the bottom of the tanks as would normally have been the case had the butterworthing process been properly completed, the complete inside of the tanks still contained petroleum residues which had to be cleaned off.

The court stated that "the evidence shows that there was, in fact, an affirmative representation made by Siosa that the tanks of the vessel Perseo had been completely butterworthed on the voyage from Europe, and that the tanks were thus ready for the final cleaning up, the only job which Wilmar actually contracted for". The court found that the parties entered into an oral contract on April 11, 1965, superseding the written contract, providing for Wilmar to be paid only the actual costs of labor and material for cleaning the tanks. This contract, the court held, "was not * * * conditioned upon approval by a third party or upon completion within a certain time".

## I.

We find that time was of the essence to the shipowner: performance of the tank cleaning by the terminal date fixed in the contract was a vital element in the agreement of the parties. All of the while the Perseo was in New Orleans and in Baton Rouge Siosa was under the compulsion of meeting deadlines, as Wilmar knew. The contract of April 7 provided:

> Work will probably be completed by Monday night midnight April 12th. *Anyway vessel must be in Baton Rouge by 12 noon on April 13.* Normal overtime rate will be charged if necessary. [Emphasis added.]

The first sentence is indefinite as to the completion date because Willhoft hoped to finish the work before the twelfth. Wilmar was protected by the provision that its services would be calculated at the rate of $4.20 a man-hour, which included profit. Siosa was protected by the agreement on a maximum price of $31,000 and by the requirement that the job be finished by the thirteenth, at the latest, in Baton Rouge. It is undisputed that Grimaldi informed Willhoft that the Perseo had to be in Baton Rouge on July 13 to enable Siosa to comply with a charter committment.

On March 12, 1965, Siosa had time-chartered the Perseo to Tradex Export, S.A. for three consecutive voyages to carry grain. The charter provided that the Perseo was to be inspected and approved for grain by official inspectors before 12 noon on April 8, 1965, at the loading port (later designated as Baton Rouge). Failure of the vessel to pass inspection gave the charterer the option of cancelling.

To prepare for carrying grain instead of oil, the crew chemically cleaned and butterworthed the Perseo's tanks on the sea voyage. Grimaldi testified that at the time he expected the ship to be ready to load her grain cargo by April 8. Siosa had purchased cleaning equipment and chemicals for butterworthing from Gamlen, a European firm that specialized in tank cleaning, and employed a Gamlen technician to supervise the work while the vessel was at sea. The butterworthing was not effectively completed because of bad weather and other difficulties, such as clogged condenser pipes.[6]

6. The Perseo's tanks had two butterworthing openings, instead of four, making it difficult to reach all the interior surfaces. In addition, Wilmar contends that the crew used very hot water in butterworthing, contrary to the proper practice of using cold or lukewarm water; hot water breaks the oil down and leaves only

Siosa diverted the ship to Bermuda where new pipes, flown over from England, were substituted for the clogged pipes and where ten Bermudians were hired to help the crew in cleaning the tanks. After forty-eight hours in Bermuda, the ship sailed on March 31. The crew and the Bermudians continued to work on the tanks during the voyage to New Orleans.

Grimaldi boarded the Perseo April 6 at Pilottown, near the mouth of the Mississippi River. At his request, that morning a Mr. Peterson, head of a tank cleaning firm, came aboard to examine the tanks. He stated that he could not clean the tanks in only two days, and he declined to undertake the job without first making tests with chemicals. Grimaldi, realizing that the charter deadline of April 8 could not be met, cabled his office in Genoa, saying that he needed three or four more days of cleaning at a cost of $20,000 to $30,000. The charterer granted an extension to April 15, but with a reduction in the freight rate of 25 cents a ton for each of three voyages.

Grimaldi then arranged a meeting with Raymond G. Willhoft, Secretary-Treasurer of Wilmar. Willhoft came aboard on the night of the sixth, sometime between eleven and midnight, accompanied by his foreman, Jones, and an assistant-foreman, Gasquet. According to Grimaldi, Willhoft changed into his overalls and spent forty-five minutes inspecting the tanks. Captain Monti, the master, and Mike Piccolo, a ship chandler who acted as an interpreter, also testified that Willhoft inspected the tanks. At that time Willhoft told Grimaldi that he estimated that the work could be done in five or six days at an estimated cost of $24,000 to $27,000. He left the ship about four in the morning. Willhoft returned the next day with his foreman, Jones. According to Grimaldi and Captain Monti, Willhoft made a second inspection accompanied by the chief mate

and second mate. The contract was .signed about noon. Grimaldi said that he "actually saw Willhoft, his foreman, and my first officer go down and come out of the tanks." Willhoft's overalls, gloves, and shoes were "dirty with grease" and oil.

Willhoft denied that he. entered any tank before signing the contract. He also denied that he had been told of any difficulties that might have impeded the butterworthing. But he must have known about some of the difficulties for he testified:

Q. Was the ship equipped for Butterworthing operations at sea?

A. No, because each tank only had one butterworth opening and that was right alongside the expansion trunk, which is the main entrance to and from each tank. It was right alongside so the hose didn't do any good. They couldn't put the Butterworth machine in the far corners of the tanks, only in that one area, so consequently they couldn't hit the other areas. * * *

A. Most [ships] have four Butterworth openings. They use the expansion trunk for one and one opening in each corner of each tank.

Jones, the foreman, testified that he accompanied Willhoft the first time he went aboard the Perseo. Jones said that he and Gasquet inspected the tanks while Willhoft talked business in the Captain's cabin. They went down only about six feet into the tanks because the ladders were slippery with oil and grease. Jones noticed that there was grease and oil residue on the upper areas of the tanks, on the shelves (frames), and on the skin of the ship. Jones had butterworthed and therefore knew that if the tanks had been completely butterworthed, they would have been cleaned in the upper areas; only the bottoms and lower areas would have required further cleaning. Jones and

---

the paraffin contained in the crude oil. Paraffin was the "biggest problem on the ship". Battcock testified, however, that it

was not unusual to use water at 180 to 200 degrees Fahrenheit.

Gasquet had flashlights but could not see to the bottom of the tanks. Jones also knew that because of the frames or shelves protruding into the tanks, cleaning would be difficult even with butterworthing.[7] Upon leaving the ship, Jones told Willhoft:

> The tanks "don't look too hot. * * * Man, looks like it got plenty of grease in it. * * * It don't look like they been butterworthed."[8] [Willhoft] replied "that the captain * * * told him they had been butterworthed already, so he [Willhoft] said probably we can see better when we come back because it was so dark."

The preponderance of the evidence incates that Willhoft made at least one inspection. But whether *he* inspected once or twice or not at all before signing the contract is immaterial in the light of the unquestioned inspection by his foreman and his assistant foreman and his knowledge that Jones, the foreman, thought that the tanks were so bad that they could not have been butterworthed.

Grimaldi testified that Willhoft "was quite aware of the situation" and had been "told by the first mate and the captain of what had been done during the crossing". Captain Monti testified that he and the first mate "tried to give Willhoft a good idea"; that "[b]efore we started the discussion about the time and money, we explained to Mr. Raymond [Willhoft] the work that had been performed by the crew and as I remember well, on this occasion Mr. Raymond asked some questions to the chief officer in regard to the Butterworth"; that "Dr. Grimaldi tried to explain that all of the tanks had been treated with salt water and a second time they had been cleaned with this Gamlen product but that they could not have had a chance to finish the cleaning because of the lack of time to dedicate to this work * * *

the ship had trouble with the condenser and this is why they were able to start efficient cleaning of the tanks only after they sailed from Bermuda."

■■ We conclude that the district court erred in finding that there was "an affirmative representation" that the ship had been *"completely"* butterworthed" in the sense that a complete butterworthing would have cleaned the upper areas of the tanks and would have required Wilmar to remove only muck and scale from the bottoms of the tanks. Wilmar did not rely on an "understanding" that the ship had been completely butterworthed. He relied on inspection of the tanks. Moreover, the inspection made by the foreman and his assistant obviously was adequate to determine whether the butterworthing had been effective: Jones accurately gauged the condition of the tanks. Willhoft's mistake was to disregard the information he received from his foreman. But a miscalculation of the extent of the work to be performed is a risk all contractors run.

## II.

The contract was modified on two occasions. There is no evidence in the record, however, that Siosa ever waived the requirement that the vessel be cleaned "to the satisfaction of inspectors of the National Cargo Bureau and the Board of Trade". Nor is there any evidence that Siosa deviated from the requirement that the terminal performance date, as modified, be respected.

The first modification of the contract occurred on April 11, 1965. It concerned only the actual costs beyond the contract price of $36,000 to be paid for Wilmar continuing to work on a losing contract; Wilmar waived all profit on the job. James S. Ryan, President of

---

7. Each tank had three shelves, the upper one about six feet from the top. The shelving was apparent to Jones, therefore, even though he went only about six feet down the ladders in the tank.

8. Even though Jones reported to Willhoft that it looked as if the tanks had not been butterworthed he estimated that the tanks could be cleaned in four or five days.

Wilmar, met with Grimaldi aboard the Perseo. Ryan testified:

> A. I told him that our costs had reached the sum of some $36,000 and he agreed that according to his figures and his records aboard the ship that he realized that they had gone to some $36,000.00 and he said $36,000.-00, to be specific. I couldn't work it out that close myself but evidently he had and then he said that—I indicated to him that we couldn't continue to do this work because if he held us to the contract, we would be losing money. The more we worked, the more money we would lose. So Dr. Grimaldi told me then that he realized that and that he wanted us to continue working and that he would meet our costs. He said—the way he put it was, "I will make sure that you don't lose any money but won't make any money either." He said "You won't lose any money."
>
> Q. Was it you understanding that that was contingent upon the vessel's being passed by noon of the 13th?
>
> A. Well, the time element at that particular moment didn't enter into it.

Neither Ryan nor Willhoft indicated that it was impossible to complete the job, but only that Wilmar would lose money. The very day the contract was modified two inspectors from the New Orleans Board of Trade, Marconi and Schultz, as a favor to Willhoft (it was a Sunday), boarded the Perseo to appraise unofficially the prospects of the vessel being approved by the Baton Rouge inspectors by April 13. Marconi looked at six or seven of the tanks and found some of them about 90 per cent completed.

Grimaldi was willing to cooperate with Wilmar only if the contract date were respected. He testified:

> I was prepared to meet them—I was willing to collaborate with them in connection with the expenses provided the contract date was respected.

> * * * because every time that I discussed this work the question of the date of consignment was considered sacred.
>
> * * * * * *
>
> Because I had obtained seven days of extension of cancellation date from the 8th to 15th April was a personal sacrifice of about $20,000.00, and I was not prepared to meet a further loss in freight rate.
>
> I promised * * * that I would have collaborated with them, that I would meet them.
>
> * * * * * *
>
> I intended saying that if the cost incurred by Wilmar had been greater than that established by contract, I would consider recognizing something more, but always on the condition that the ship be passed on April 13th at twelve o'clock as provided by the contract. * * *

Piccolo, interpreting for Grimaldi, testified: "Mr. Grimaldi say, 'I cooperate as long as I have a ship going to be passed on such and such a day.' That mean the 13th or 14th." Captain Monti's testimony agrees with Grimaldi's: "If the ship will be ready and approved by surveyor and [on] the date established in the contract, [Grimaldi said] I will meet you." "He turned around to Mr. Ryan and with energy he told him in Italian, 'If you make [it] in time to clean the tanks, I will meet you.'" Marconi, called as a witness by Wilmar, said that when Grimaldi made the verbal agreement, "he mentioned something about time". "He mentioned the time, that he was going after a certain date. After a certain day, he was going to lose a thousand dollars a day."

Wilmar contends that Ryan agreed only to "do the best we can". But from the inception of the tank cleaning contract Willhoft knew that the possibility of Tradex's cancelling the charter had made time of the essence to the shipowner. It is impossible to believe that the shipowner should risk the loss of $300,000 in freights, and agree to a

price far exceeding the original "maximum price of $31,000"—except on the condition that the performance date be respected.

The importance of the performance date was underscored by the second modification of the contract. This took place on April 12 when the parties agreed to extend the deadline from April 13 to April 14 at Baton Rouge. Grimaldi initiated this extension because the work could be accomplished more readily in New Orleans than in Baton Rouge. There is no doubt however that both parties regarded this agreement as extending the terminal date to April 14.

Grimaldi testified:

A. The ship was scheduled to leave [April 12] so as to arrive in Baton Rouge on the morning of the 13th, but after carefully examining the situation with the Captain, we arrived at the conclusion that it was better to stop a further 24 hours in the port of New Orleans so as to allow Wilmar to utilize the whole of its potential capacity, so we decided to put off sailing to Tuesday, 13th, so as to reach Baton Rouge the morning of the 14th; but as you well know the date of cancelling was 14th so that originally we had two days of leeway and by this arrangement we reduced it to only one day for meeting any possibility which might have been, fog or any other circumstances.

Q. And what was done in regard to the contract date of noon, April 13th?

A. Speaking to Willhoft I said "We leave you a further 24 hours for you to utilize in the port of New Orleans" and we sailed at the end of the day shift of April 13th.

Q. And did Mr. Willhoft in this conversation give any assurance of the time of the completion of the work and approval?

MR. READ:

I note the same objection, that is to a leading question.

A. Mr. Willhoft expressed his great satisfaction for granting him a further 14 hours and assured me that he would carry out all efforts so as to bring the ship in a clean condition to Baton Rouge by causing to come on board another shift of workmen to carry out the work during the transit between New Orleans and Baton Rouge.

Willhoft's own testimony shows that he understood that the cleaning would be subject to the approval of the inspectors at Baton Rouge. Willhoft was asked what Marconi told him on Sunday, April 11th. Willhoft testified:

A. He told me in his opinion if the ship was going to be loaded in New Orleans, it was ready to be passed.

Q. He told you that it would have passed that Sunday?

A. Just with a little minor touching up, it would have been all right.

Q. So it wasn't quite ready?

A. We still had to work from New Orleans to Baton Rouge and with that amount of time, it could have been completed.

Q. Now, wait a minute. Let's back off here and let you tell me exactly what Mr. Marconi's opinion was. I missed you there. At first I understood you to say he said it was ready. Then he added that some minor work yet had to be done. Just what was his opinion?

A. His opinion was that the ship was good, that with a little more work it would have been completed. So we still had two shifts to work. With two shifts it will be ready, provided this done and this is done and this is done, we would have been all right.

### III.

On April 13 the Perseo left New Orleans for Baton Rouge. On the morning of April 14 Captain Norman G. Battcock, a surveyor for the National Cargo Bureau and two inspectors for the Baton Rouge Port Commission inspected the tanks. Battcock had served twenty-two

years at sea, thirteen of those as a master. He testified:

A. There was oil residue, there was scale, there was wax and the ship wasn't ready to load grain.

\* \* \* \* \* \*

A. There was lime.

Q. What was the lime for?

A. Could have been to make them smell a little better or possibly cover up.

Q. Cover up what?

A. Cover up oil.

Q. Did it appear to be in the nature of a camouflage?

\* \* \* \* \* \*

A. No. A lot of tankers sprinkle lime around. It makes them smell sweet and if there is no dampness of any kind, it doesn't hurt the cargo, as far as I know. It's not recommended by anybody that I know of.

Q. Did you object to the presence of lime covering this residue?

A. Yes. There was too much. I got burned from that lime.

Battcock brought up a handful of sludge to demonstrate that the tanks were not clean. The three inspectors refused to "pass" the Perseo. They returned the next day, April 15.

As to his second inspection, Battcock testified:

Q. And what did you find on the 15th with respect to Wilmar's cleaning work?

A. Same as I found on the 14th. She still wasn't ready to load grain.

\* \* \* \* \* \*

A. As far as I was concerned, no improvement. The ship still wasn't ready to pass.

The three inspectors again refused to pass the Perseo, although the two inspectors of the Port Commission thought that most of the tanks were clean. At this point it was evident to Grimaldi that Siosa needed another extension of the charter. Tradex granted the extension to April 22 but exacted a

further reduction of 20 cents a ton in the freight for the first voyage.

Acting on a suggestion by Battcock, Siosa employed the services of Maritec Company to re-butterworth the entire ship. Wilmar's men and the crew continued to work along with Maritec's men.

April 22 the vessel was again tendered for inspection. This time the Port Commission inspectors passed the Perseo, but for the third time Battcock refused to pass the ship. He testified: "It still wasn't ready to load grain." Battcock stated that Mr. Ryan had offered him the keys of a new car in return for passing the ship. He refused the offer and reported the incident to his superior, Captain Sise. The following day Captain Sise inspected the tanks. He approved Battcock's third rejection.

According to Captain Monti, Battcock had complimented him on the crew's having cleaned "those few tanks which he found in order" and suggested to the Captain that "if I had finished the tank cleaning with our personnel, certainly we would have in a short time good results without throwing away more money by sending on board the personnel of Wilmar who, he thought, were not organized". At the time, April 23, Grimaldi was in Italy and had cabled Wilmar to cooperate with the master and to send a shift of "at least 10/15 laborers with foreman for completing the work".

On the morning of the 25th fifteen workers from Wilmar arrived at the dock. Captain Monti testified: The foreman told him that Captain Battcock had "insulted him [the foreman] by telling him that if he should return to work on the Perseo, he would have to clean the tanks to a shine before approval would be granted. Following the conversation, that attests my opinion concerning the friction between Wilmar and the surveyor, I decided to send back the Wilmar personnel on the basis that being without precise instructions, I would proceed to clean the tanks with the ship's crew only."

At long last, on April 27, 1965, Captain Battcock issued a National Cargo Bureau certificate certifying that the tanks of the Perseo were clean for the carriage of grain.

## IV.

Professor Arthur L. Corbin states the general legal principle applicable here:

A supervening discovery of facts that make the promised performance more difficult or expensive, or the occurrence of subsequent events having this effect, if they are such as are commonly foreseeable and in contemplation, has almost always been held not to discharge the contractor from his duty. No doubt, a contractor usually understands that, in the absence of express limitation, the risk of such difficulty and expense is for him to bear. So, one who contracts to make a foundation or a tunnel or other excavation usually investigates for himself the character of the location, whether it be sand or solid rock or swamp or frozen mixtures, before making his estimates and offers. Therefore, risk is usually borne by the contractor; he is not discharged from duty by actually unexpected difficulty or expense, and he has no right to extra pay for completing the job. 6 Corbin on Contracts § 1333.

Here, the contractor inspected the tanks before entering into the contract. What Wilmar now calls a supervening discovery was evident to the foreman and should have been evident to Willhoft before he signed the contract. See Corbin on Contracts §§ 308, 309, A. L.I. Restatement on Contracts § 467; Cramp Shipbuilding Co. v. Luckenbach S.S. Co., Inc., 3 Cir. 1950, 181 F.2d 939; The President Roosevelt, 2 Cir. 1940, 116 F.2d 420.

Absent an affirmative representation that the tanks had been "completely butterworthed", and we find no such representation here, Cramp is indistinguishable from the case before the Court. In Cramp the contracting shipyard sued for compensation beyond the agreed price on the ground that it was compelled to do extra work in repairing damaged metal plates on the hull of a vessel. The court held:

We do not see how the cost of repairing these rivet holes can be called a new item for which respondents must pay. * * * As to the other elongated rivet holes, the contractor certainly knew that here was a ship which had been through the war. There could have been as much inspection as it cared to make at the time bids were invited. Certainly Cramp did not intend to take down, repair and replace plates only to rivet them back through elongated rivet holes. If the expense of making the rivet holtes right was greater than the contractor anticipated, that is one of the risks of undertaking such a job. There was no supervening impossibility. The most that happened was that the job turned out to be a harder one than the contractor thought when he made his bid."

A contract to repair a vessel is maritime. North Pacific Steamship Co. v. Hall Brothers, 1919, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510; Alcoa Steamship Co. v. Charles Ferran & Co., 5 Cir. 1967, 383 F.2d 46. However, in the determination of a mutual mistake and effect of unforeseen difficulties, there are no principles peculiar to maritime law that distinguish a marine contractor from other contractors.

Picard Construction Co. v. Board of Commissioners of Caddo Levee District, 1926, 161 La. 1002, 109 So. 816, 817 is strikingly similar to the present case. Contractors sued a levee district to recover compensation above the contract price. The contractors alleged that they encountered difficulties unknown to either party, that they notified the district of their intention to claim additional compensation, and had been told to proceed with the work; the amount of additional compensation would be adjusted on final completion of the contract. Since a public board has no au-

thority, under the Louisiana Constitution, to grant gratuitous compensation to contractors, the case turned on whether the contractors were obligated to complete the contract without any right to claim compensation for the unforeseen difficulties they encountered. The Louisiana Supreme Court held that the "difficulties were 'risks within the limit of [the contractor's] undertaking' and he took them to that extent as a necessary incident to his having entered into the contract at all". The Court said:

But under our law there is a sanctity about contracts as great as elsewhere: "Agreements legally entered into have the effect of laws on those who perform them. * * *" R.C.C. art. 1901.

Hence it follows that a party is *obliged to perform* a contract entered into by him *if performance be possible at all*, and regardless of any difficulty he might experience in performing it; thus:

The object of a contract must be possible. * * * The possibility must be determined, not by the means or ability of the party to fulfill his agreement, but by the nature of the thing which forms the object of it." R.C.C. art. 1891.

But such legislative dicta would be inane, if a party to a contract, upon finding that the thing which he has undertaken to do, though certainly possible, is yet difficult for him to perform, were thereupon permitted to escape his obligation upon the plea that he was in error "as to the substance of the thing which was the object of the contract."

The fact of the matter is that there is in such cases no error whatever as to the thing which was the object of the contract; the error on the part of the obligor then being *not* upon the matter of the contract, but as to *his own ability to perform the contract*, or the difficulty he might have in performing it.

And the difficulty one may have in performing a contract is simply no excuse whatever for not performing it * * *."

We hold that the contract was binding on the parties and that Wilmar's failure to complete performance by April 14, 1965, breached the contract. Wilmar is therefore liable for the damages resulting from that breach.

Nonetheless, "Even if the plaintiff's non-performance is a breach of his contractual duty for which the defendant has a right to damages, there are many cases in which it is not just to permit the defendant to retain the whole benefit of the plaintiff's part performance without paying anything in return." Restatement, Contracts § 357(f). See also 5 Williston on Contracts § 1475, notes 2, 5 (Rev.Ed.); Dermott v. Jones, 23 How. 220, 64 U.S. 220, 233, 16 L.Ed. 442; American Surety Co. of New York v. United States, 9 Cir. 1966, 368 F.2d 475; Power-Matics, Inc. v. Ligotti, 1963, 79 N.J.Super. 294, 191 A.2d 483. Here Siosa suffered damages but benefitted from Wilmar's partial performance of the contract. In these circumstances the equities require that the damages should be off-set against the value of the benefit to Siosa. At the same time, a plaintiff in default should not be allowed to profit by his own wrong. Accordingly, we would allow Wilmar (as did the district court) the actual cost of labor and material expended in cleaning the tanks of the Perseo. Since the amount Wilmar expended is directly related to the quality of the work performed, the costs allowed Wilmar should be reduced to the extent that Siosa is able to show that some of the costs were attributable to Wilmar's breach of the warranty of workmanlike performance. In any subsequent hearing dealing with the alleged breach of warranty of workmanlike performance, the district court may wish to hear further evidence on the extent of the damages Siosa suffered as a result of Wilmar's non-performance of the contract.

We affirm the district court's holding that Siosa is indebted to Wilmar for the sum of $5,940, representing the contract

price agreed upon for the fabrication and installation of the roseboxes and sounding pipes aboard the Perseo.

We reverse and remand for further proceedings consistent with this opinion.