## THE HIRAM R. DIXON.[i]

### LORD et al. v. THE HIRAM R. DIXON.

*(District Court, E. D. New York. December 15, 1887.)*

1. **MARITIME LIENS—SUPPLIES—BEFORE VESSEL LAUNCHED.**
   A contract to furnish necessaries for the use of a vessel during a voyage at sea is a maritime contract, though, at the time of making the contract, the vessel be not launched.
2. **SAME—CONTRACT—SUPPLIES IN FOREIGN PORT.**
   When a contract contemplates the furnishing of supplies to a vessel at a foreign port, it is to be presumed that a lien on the vessel was contemplated by the parties, unless something to the contrary appears.
3. **SAME—MARITIME CONTRACT—TO SUPPLY FISHING-NETS.**
   A contract to furnish nets to a fishing vessel is a maritime contract, in view of the subject-matter, though the contract be made on land and nets delivered on land; and if such nets are furnished when the vessel is in a foreign port, a lien for their price is created on the vessel.

In Admiralty.

*Lindsay & Flammer,* (*Geo. F. Betts* and *Saml. R. Betts,* of counsel,) for libelants.

*Ludlow Ogden,* for claimant.

*Stern & Myers,* for Kessler.

BENEDICT, J. This is a proceeding *in rem* to enforce against the steamer Hiram R. Dixon a lien for the price of certain fishing-nets. The facts are not in dispute. In 1883, the steamer proceeded against was built at Mystic Bridge, in the state of Connecticut. In April of that year, upon being launched, she was towed to New York to receive her boilers and engines. For that purpose she remained in New York until July 4, 1883, and while there was enrolled, that being the residence of her owner. After her enrollment she proceeded to Bristol, in the state of Rhode Island, and there received her outfit for a fishing voyage. As part of her outfit for that voyage she received on board the nets in question, and thereafter proceeded to sea, and with them engaged in the business of catching menhaden. These nets the libelants made to order for this vessel, upon request of Hiram R. Dixon, for whom the vessel was then being built at Mystic Bridge. Pursuant to directions from Dixon, the nets when completed were sent to William M. Fish, the des-

———

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

ignated master of the vessel, who was then at Bristol Ferry, where the vessel was to be fitted out for a fishing voyage under his direction. Fish received the nets in May, 1883. At this time the vessel was in New York receiving her boilers and engines. From New York, as already stated, she steamed to Bristol Ferry, and thence, after receiving these nets and other outfit for her intended voyage, she proceeded to sea. The nets not being paid for, the vessel, when she arrived in this district, was seized in this proceeding.

There is no controversy as to the receipt of the nets and the amount due therefor, but the claimants say the libelants have no lien. And first they contend that the contract sued on was not a maritime contract, because when the nets were contracted for there was no vessel. The Hiram R. Dixon was not then launched, but was merely a hull, expected to become a vessel in process of time, but which nevertheless might never become one. According to my understanding, the contract to furnish necessaries for the use of a vessel during a voyage at sea is a maritime contract, whether at the time of making the contract the vessel be already launched or only about to be launched; and for the reason that in one case as in the other the contract relates to navigation, business, and commerce on the sea. In this case, the sole object of the contract sued on was to enable this vessel to make a contemplated fishing voyage. The nets were made for this particular vessel, and without these nets the voyage then contemplated could not have been undertaken. They were an essential part of the outfit of the vessel for such a voyage. These features are the elements of a maritime contract. A seaman, shipped for a particular voyage on a new ship then on the ways unlaunched, who should join her when launched and perform the voyage, surely would not be debarred from recovering his wages in admiralty. But in that case it would be as truly said as in this that the contract is not maritime, because when it was made there was no ship. Many charter-parties have no doubt been signed when at the time the ship lay "in the deep bosom of the ocean buried;" but could it be successfully contended in such a case that the charter was not a maritime contract? The question is whether the contract enables the ship to pursue her business on the sea. If in the contemplation of the parties to the contract such is the object, and if such be its effect, the contract is a maritime contract, although it be the fact that at the time the contract is made the ship is unfit for sea, or even on the ways, as yet unlaunched.

It is pointed out by the advocates for the claimants that the contract in question was made on land; to be performed on land; that to construct the nets required three months of time on land; and that the delivery of the nets took place on land. True, but the nets were not constructed to be used on land. They were made to be used in fishing, and by this particular vessel, on the sea. Attention is also called to the fact that when the nets were delivered at Bristol Ferry the vessel had not arrived at Bristol Ferry, but was taking on board her boilers and engines at New York. She was, however, expected to arrive at Bristol Ferry; and the master of the vessel there received the nets for the use of the

vessel, to which use they were applied when she did arrive. The test of locality is now abandoned. The true test is the subject-matter. The subject-matter of this contract is the outfit of the vessel for a fishing voyage from Bristol Ferry, and the sole object sought to be attained by the contract was the accomplishment of such a voyage. Such a contract relates directly to navigation, business, and commerce on the sea, and is therefore maritime. The contract being maritime, and the nets being necessary for the vessel to enable her to perform an intended voyage, and being received on board at Bristol Ferry, where she was a foreign vessel, by the maritime law a lien attached to the vessel enforceable in admiralty. So, also, in my opinion, an action *in personam* against the owner could have been maintained in admiralty upon the contract when performed.

Again, it is contended that the contract was one for original equipment, and therefore not maritime. The case of *The Thomas Jefferson*, (*People's Ferry Co.* v. *Beers*,) 20 How. 393, is cited as authority. In the case of *The Thomas Jefferson*, a contract for building the hull of a ship was held not to be a maritime contract. The only reason given, is that the contract was made on land, to be performed on land, and had no reference to a voyage to be performed. Considering the time when it was made,—1857,—this decision is to some extent explained by the statement in the opinion that "the question presented involves a contest between the state and federal government." In the subsequent case of *The Capitol*, (*Roach* v. *Chapman*,) 22 How. 129, argued by Judah P. Benjamin, in 1859, a contract for building a ship, or supplying engines, timber, or other materials *for her construction*, was held not maritime, upon the grounds stated in the case of *The Thomas Jefferson*, that the contract was a contract for construction, made on land, and had no reference to a voyage to be performed. These decisions are still law in cases for constructing a ship, made without reference to a voyage to be performed. "The effect of these decisions is not to be extended by implication to other cases." *Insurance Co.* v. *Dunham*, 11 Wall. 28. They do not control this case, because the contract for these nets did have reference to a voyage to be performed, and besides was not a construction contract. The nets were to be used on a then contemplated voyage, and the sole object of the contract sued on was to enable that voyage to be performed. When they were received by the vessel she was already constructed, and had made a voyage from New York to Bristol Ferry.

As the decisions of the supreme court now stand, wages of shipwrights, earned in the building of a steamer, engines and boilers entering into her construction when she is built, if contracted for without reference to a voyage to be performed, are not maritime contracts. The supreme court has yet to hold that contracts to make nets for a contemplated fishing voyage of a fishing vessel are not maritime because made on land, and without reference to a voyage to be performed. Since the decision in the case of *The Thomas Jefferson*, other courts have held that a contract for sails made for and fitted to a ship when being built, and even a contract for anchors and chains furnished a ship when being built, are not

maritime contracts. As to which cases it may perhaps be justly said that without the articles in question the vessel could make no voyage at all. But not everything furnished a ship while being built goes into her construction. Does coal furnished a steamer before she is launched go towards her construction? Are the furnishers of harpoons and lines to a whaler before she is launched builders of the ship? No more are these net-makers. That fishing instruments are not to be deemed part of the ship itself appeared as long ago as the laws of Oleron. See Godol. London, 1661, App., containing an extract from the ancient laws of Oleron, No. 25. And so, as I conceive, has the law remained until this day.

My finding, therefore, is that these nets are constructed for this vessel, in pursuance of a maritime contract, and that they were received by the master at Bristol Ferry for the use of the vessel, and that they were necessary for, and actually used by, the vessel in catching menhaden. From these findings it follows that the vessel became bound for the price of the nets, because at Bristol Ferry the vessel was a foreign vessel. She was neither built nor enrolled nor owned in the state of Rhode Island.

It is again said that the nets were furnished upon the personal credit of Dixon, and therefore there is no lien. The contract contemplated the furnishing of the nets to the vessel at the foreign port of Bristol Ferry, and it is to be presumed that a lien upon the vessel was contemplated by the parties themselves, unless something to the contrary appears. It matters nothing that the nets arrived at Bristol Ferry before the vessel did. They were sent there in anticipation of the vessel's arrival, in order to be put on board her there, and they were there received by her. Nothing in the contract or correspondence is sufficient to show the absence of an intention to sell the nets upon the credit of the vessel. It is indeed true that the libelant's order-book contains no charge against the vessel, but neither the absence nor the presence on the books of a charge against the vessel is conclusive. The omission to mention the vessel in this instance is explained by the fact that the vessel was then unnamed. Here the burden is upon the claimants to show facts from which an intention to rely solely upon the credit of the owner can be inferred, and such facts have not been made to appear. So as to the defense of laches. No laches is shown. Indeed this defense has not been urged in argument.

My conclusion therefore is that the libelants are entitled to recover in this action against the vessel proceeded against the amount due according to the Schedules A and B, attached to the libel, the other items having been waived. For the amount of these two bills Schedules A and B, with interest and costs, let a decree be entered.