**JOHNSON & TOWERS BALTIMORE, INC.**

v.

**THE DREDGE, her engines, tackle, etc.**

Adm. No. 4652.

United States District Court
D. Maryland.
May 20, 1965.

Joseph W. Janssens, Jr., and Southey F. Miles, Jr., Baltimore, Md., for libelant.

Floyd J. Kintner and Kintner & Evans, Elkton, Md., for respondent.

THOMSEN, Chief Judge.

Libelant seeks to establish and enforce a maritime lien against a dredge for work, labor and material furnished to the dredge on the order of a former owner. Claimant, the present owner, has three lines of defense: (1) that the dredge is not a vessel and therefore not subject to a maritime lien; (2) that by virtue of a Maryland statute (Code, Art. 23, secs. 34–38) libelant's lien was subordinate to a mortgage which was foreclosed, and therefore subordinate to the rights of claimant, which acquired the dredge from the purchaser at the foreclosure sale; and (3) that libelant, by its acts and failure to act, is estopped to assert its lien against claimant.

The dredge is a conventional marine pipeline dredge, 110 feet long, 55 feet wide, with a draft of about 4 feet. At all material times it has been located along the shore of a little point in Kent County, Maryland, where Stillpond Creek enters Still Pond, a small inlet of the Chesapeake Bay. The tides ebb and flow through the mouth of Stillpond Creek, which has a depth of only 3 feet at low tide, but is navigable by outboard boats. The dredge was probably towed through the mouth of the creek at high tide about 10 years ago. Since then it has been used in connection with a sand and gravel washing plant on the point some 200 feet from the water. In its operations it is pulled ahead by its own cables and winches. Its inshore cables are attached to trees on the point and its offshore cables to anchors. The winches are operated by electricity generated on the dredge. The generator also furnishes power for the machinery at the washing plant on the point. The dredge is hauled or towed from time to time to new positions along the shore, depending upon whether sand or gravel is needed. It usually floats on an even keel in about 4 feet of water, sometimes in areas it has itself deepened from the

1–3 foot average depth along the shore line of the point.

The dredging is not done for the purpose of widening or deepening any channel or for any other maritime purpose, but for the purpose of producing sand and gravel which is sold commercially on the shore. The dredge is capable of being used for maritime work, but there is no evidence that it has been used for any maritime purpose since it was brought to Stillpond Creek, nor indeed at any time in the past. The dredge is not documented, and is taxed as part of the personal property of its present owner by Kent County, which, according to the evidence, does not tax boats and other vessels.

The plant and dredge were purchased by the McDaniel Sand and Gravel Company in December 1960. In May 1962 McDaniel sold the plant and dredge to Kent Sand & Gravel Company, Inc., which gave McDaniel a purchase money mortgage in the amount of $21,848, covering the dredge and equipment, the washing plant, a crane and drag line bucket, scales and scale house, a rowboat and a sand stockpile. The mortgage did not qualify as a preferred ship mortgage under 46 U.S.C.A. § 922; it was duly recorded in Kent County. The Kent Company operated the plant for the better part of a year, and in August 1962 had libelant rebuild the power unit on the dredge at a cost of $2,174.68, of which only $250 has been paid.

In April 1963 the mortgage was in default and, after advising libelant that it was going to foreclose, McDaniel filed foreclosure proceedings in the Circuit Court for Kent County. A sale was ordered and was held on May 1. McDaniel purchased the property covered by the mortgage, including the dredge, for $6,-000. The sale was reported and ratified nisi. On July 18 libelant filed exceptions to the ratification of the audit, alleging that it had overhauled the engines on the dredge in August 1962 and that for such work performed and materials furnished it held a prior lien on the dredge under 46 U.S.C.A. § 971. McDaniel answered the exceptions, contending that the dredge was not subject to that Act because it was not engaged in any maritime operation, and claiming priority for the balance due under its mortgage, which exceeded the proceeds of the sale. On August 20, for some reason not shown by the evidence, libelant dismissed the exceptions which it had filed to the audit, and the audit was finally ratified on August 26.

Meanwhile, whether before or after August 20 does not clearly appear from the evidence, McDaniel had sold the plant, including the dredge, to Still Pond Corporation, a recently organized Maryland corporation, in which McDaniel owned half of the stock, the other half being owned by John H. Walters, who put up some new money.

The libel in this case was filed seven months later, in March 1964.

### Discussion

■ If the dredge were a vessel within the purview of the statute creating a federal maritime lien for repairs, 46 U.S.C.A. § 971 et seq., libelant's lien would take precedence over the mortgage, which was not a preferred ship mortgage. The cases relied on by claimant to show that under those circumstances the Maryland statute would control [1] were decided before the passage of the Act of June 23, 1910, 36 Stat. 604,[2] and before the decision of the Supreme Court in The J. E. Rumbell, 148 U.S. 1, 13 S.Ct. 498, 37 L.Ed. 345 (1892). They are no longer the law. The Easby, D. Md., 201 F. 585 (1912).

The question, therefore, is whether the dredge is a vessel within the purview of 46 U.S.C.A. § 971, which provides:

"Any person furnishing repairs, supplies, towage, use of dry dock or

---

[1]. The Marcelia Ann, C.C.D.Md., 34 F. 142 (1887), and The D. B. Steelman, E.D. Va., 48 F. 580 (1880).

[2]. The predecessor statute to that now codified as 46 U.S.C.A. § 971 et seq.

marine railway, or other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel."

The term "vessel" is defined in 1 U.S.C.A. § 3 to include "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water". Nevertheless, as Chief Judge Caleb M. Wright noted in Dann v. Dredge Sandpiper, D.Del., 222 F.Supp. 838, 840 (1963), "maritime matters are not literally controlled by reference to vessels and to navigable waters. * * * A dredge may have the characteristics of a vessel, may be located in navigable waters, and still not be within the cognizance of the admiralty jurisdiction."

In J. C. Penney-Gwinn Corporation v. McArdle, 5 Cir., 27 F.2d 324 (1928), cert. den. sub nom. Lancaster Iron Works v. J. C. Penney-Gwinn Corporation, 278 U.S. 632, 49 S.Ct. 31, 73 L.Ed. 550 (1928), a dredge located in Biscayne Bay was engaged in filling land by pumping sand from the bottom of the bay. Maritime liens were claimed for supplies furnished the dredge while engaged in that venture. The Court said:

"There is no doubt that a dredge-boat engaged in navigation, or in doing work for the purpose of improving a channel, or that will be an aid to navigation, in certain circumstances, is subject to admiralty jurisdiction; but a distinction is made where a vessel or other floating structure is not so engaged. It is essential, in order to maintain an admiralty lien on a vessel for supplies or advances, that she be at the time engaged in a maritime venture. It is clear that such is not the case here. Of course, the dredging deepened the water where the material was removed; but that was merely

incidental to the work being done. The dredges were not engaged in either commerce or navigation. The purpose of employing them was to make improvements on land, not for the purpose of aiding maritime commerce, but to fill up the land, in order to bring it to the required grade, for the purpose of sale." 27 F.2d at 325.

In Henderson Bros. v. The Tipple Boat, No. 2, N.D.W.Va., 97 F.Supp. 507 (1951), affirmed 4 Cir., sub nom. Jeffrey v. Henderson Bros., 193 F.2d 589 (1951), the Penney-Gwinn case and other decisions were distinguished because the dredge involved in the Henderson case was a documented vessel which was engaged in a maritime operation at the time the supplies were furnished, and had not been withdrawn from navigation. In Butler v. Ellis, 4 Cir., 45 F.2d 951 (1930), the opinion distinguished the Penney-Gwinn case on the ground that the dredge involved in Butler v. Ellis "was engaged in an undertaking essentially maritime, viz., the dredging of the Intra-Coastal Waterway." See also Summerlin v. Massman Constr. Co., 4 Cir., 199 F.2d 715 (1952). Compare Cope v. Vallette Dry-Dock Co., 119 U.S. 625, 7 S.Ct. 336, 30 L.Ed. 501 (1887), Evansville & Bowling Green Packet Co. v. Chero Cola Co., 271 U.S. 19, 46 S.Ct. 379, 70 L.Ed. 805 (1926), Roper v. United States, 4 Cir., 282 F.2d 413, affirmed 368 U.S. 20, 82 S.Ct. 5, 7 L.Ed.2d 1 (1961), and Campbell v. Lozinka, 5 Cir., 181 F.2d 356 (1950), with New Bedford Dry Dock Co. v. Purdy (the Jack-O-Lantern), 258 U.S. 96, 42 S.Ct. 243, 66 L.Ed. 482 (1922), City of Los Angeles v. United Dredging Co., 9 Cir., 14 F.2d 364 (1926), Lambros Seaplane Base v. The Batory, 2 Cir., 215 F.2d 228 (1954), and The Showboat, D. Mass., 47 F.2d 286 (1930).

This Court concludes that under all the circumstances shown by the facts set out above the dredge had been withdrawn from navigation and was not engaged in any maritime activity, that it was not a vessel within the purview of 46 U.S.C.A. § 971, and the work done

and materials furnished to the dredge by libelant did not create a maritime lien, entitled to priority over the mortgage.

This decision makes it unnecessary to pass on the question whether libelant is estopped from asserting a maritime lien at this time by its failure to libel the vessel before the foreclosure proceeding, despite prior notice of the proceeding, by the withdrawal of its exceptions to the ratification of the audit, and by its delay for seven months thereafter in filing this libel, during which time new money was put into the venture by claimant.

