225 So.2d 488 (1969)
Claude TRUXILLO
v.
GENTILLY MEDICAL BUILDING, INC., Employers Liability Assurance Corp., Ltd., Safeway Janitor Service Corp., and Transamerica Insurance Company.
No. 3349.
Court of Appeal of Louisiana, Fourth Circuit.
April 7, 1969.
On Rehearing July 31, 1969.
*489 John J. Cummings, III and Robert G. Heller, New Orleans, for plaintiff-appellee.
Beard, Blue, Schmitt & Treen, David C. Treen, New Orleans, for Gentilly Medical Building, Inc. and The Employers Liability Assurance Corp., Ltd., defendants-appellants.
Loeb, Dillon & Livaudais, Marcel Livaudais, Jr., New Orleans, for Safeway Janitor Service Corp., and Transamerica Ins. Co., defendants-appellants.
Before CHASEZ, REDMANN and BARNETTE, JJ.
REDMANN, Judge.
Defendants, a medical office building owner ("Gentilly") and its janitorial service supplier ("Safeway") and their respective insurers, appeal from a judgment for damages allegedly suffered by plaintiff in a fall in a recently-mopped hallway of the building.
Plaintiff answers the appeal seeking an increase in quantum. Safeway and its insurer further appeal from the judgment of indemnity against them on a third-party demand by Gentilly and its insurer.
Plaintiff was in the building for an eye examination during which the pupils of his eyes were dilated. One of the effects of dilation is some blurring of vision.
The fall occurred as plaintiff walked down the hallway after leaving his doctor's office. Plaintiff had lost a considerable part of his left leg in a hunting accident some 40 years earlier, and had walked throughout that period with a crutch. Plaintiff testified he was walking with his normal pace when his crutch, placed about 15 inches forward, failed to grip the floor and slipped forward, causing him to fall. He claims the floor was slippery because *490 of recent mopping, done by Safeway for Gentilly, against which he was given neither protection nor warning.
Although no one witnessed the actual occurrence, plaintiff's wife was nearby, momentarily occupied putting lens prescriptions into her purse and searching for her automobile keys. Also nearby in the hallway was a then Safeway employee who had just finished "damp mopping" the hallway.
The Safeway employee testified he had mopped the area where plaintiff fell three to six minutes before the fall. He "damp-mopped" with plain water, immersing the mop but then expressing most of the water with a metal press. One pressing would leave water still running from the mop, he said, and he always pressed the mop four or five times to leave it sufficiently moist for mopping purposes but not so wet that water would drip from it. Thus, he said, there were no puddles on the floor, but there was dampness, "a film off the damp mop"; the floor was "damp dry". While he agreed improper handling of the mop during the wringing process might let water run to the floor, he testified that that had never occurred during the period he worked for Safeway.
Other persons who were summoned from the doctor's office shortly after the fall also testified. Their testimony generally was that they did not have any difficulty walking along the hallway and did not observe any wetness on the floor where plaintiff lay. The testimony of the former Safeway employee about dampness of the floor was consistent with plaintiff's testimony of slipperiness and the sliding of his crutch (and of his hand on his first effort to sit up).
We are of the view that there was sufficient evidence, especially that of the immediately prior mopping, to support the trial judge's conclusion that the floor, a sheet vinyl type regularly maintained with a synthetic finish and laid over a concrete slab, was sufficiently damp or wet to have caused it to be slippery, and that the dampness caused the crutch plaintiff had used for 40 years to slide out from under him causing his fall and injuries. We cannot say the trial judge erred in this factual determination.
Having thus concluded that the mopping operation caused the fall, the next question is whether defendants were negligent in conducting the operation.
Plaintiff's doctor regularly received patients until 6:00 p. m., and after that hour he and his associates saw patients who had by then arrived. He usually finished with his patients by 7:00 p. m., but especially if he was "running behind" it was not unusual that patients would be leaving his office at 8:00 p. m. or later, but not later than 9:00 p. m. He testified one other doctor's office had patients in the building as late as he did.
The salesman who sold Safeway's service to Gentilly testified the nightly work initially started at 9:00 p. m. because patients would still be there at six, Safeway's preferred starting time. (He apparently erred as to the initial starting hour, since his general manager testified time sheets showed they first began at 7:00 p. m.) But, the salesman testified, they found the building might have as much traffic at a later hour as at six, and by mutual agreement with Gentilly moved their starting time to six p. m. From this evidence we think the trial judge could properly have concluded that both Safeway and Gentilly knew that Safeway's work was being done at a time (whether beginning at six or seven p. m.) when patients were still in the building.
Gentilly did not require and Safeway did not provide any planned system of protecting tenants and their patients of possible danger, either by roping off mopped areas or by signs or other warning devices. The employee doing the mopping would caution persons he saw, but it happened that he did not see plaintiff and his wife and thus did not warn them. Some of the personnel in *491 plaintiff's doctor's office testified they were on occasions informed that floor maintenance operations were in progress and they would in turn advise patients; but the office personnel were not so informed the night of plaintiff's injury and did not so advise him.
Gentilly and its insurer point out a business premises owner is liable only if he caused the potentially dangerous instrumentality (the dampness on the floor in this case) to be placed on the premises or failed to remove it after real or constructive notice, LeJeune v. Hartford Acc. & Indem. Co., 136 So.2d 157 (La.App.1961), cert. denied. They argue nonresponsibility for the acts of the independent contractor, Safeway. They further argue there is no evidence that Gentilly had any knowledge that damp mopping was carried out while patients were still in the building.
In Foggin v. General Guaranty Ins. Co., 250 La. 347, 195 So.2d 636, 641 (1967), the Supreme Court notes, quoting other cases, that a person in charge of premises (as Gentilly was of the hallway here) owes to persons impliedly invited on to the premises the duty of reasonable and ordinary care, including keeping the premises in a reasonably safe condition or warning invitees of perils of which he should know in the exercise of reasonable care. Since the duty rested upon Gentilly, Gentilly cannot exculpate itself from liability for breach, insofar as its invitees are concerned, by blaming its independent contractor Safeway for failure to fulfill Gentilly's obligation.
Although placed by an independent contractor, the moisture necessarily resulted from mopping required by Gentilly to be done; thus this case is not similar to that where a third party, such as a guest in a restaurant, may leave some matter on a floor.
Nor can Gentilly escape liability for breach of its duty toward plaintiff by claiming ignorance that patients were in the building during the mopping (which was usually among the last of the janitorial routines performed from about six until nine or ten p. m.). This argument, like the independent contractor argument, does not change the positive character of Gentilly's duty to either keep its premises reasonably safe or provide warning of the danger. Gentilly knew the mopping was being done at sometime between six and ten p. m.; it did not limit its tenants' office hours, and the hour of plaintiff's accident was not so unreasonably late that Gentilly could reasonably conclude no patients would then be in the building. In our opinion Gentilly was negligent in failing to provide reasonable warning against the potential danger of the mopped floor.
Safeway argues that it was guilty of no negligence, since its mopping was done in a workmanlike manner. We find no evidence of negligence or want of skill in the mopping itself, but we do conclude that Safeway's failure to provide reasonable warning to patients it knew were in the building was negligence.
Safeway further argues that their procedures presented no danger to an ordinary person, suggesting that plaintiff's disabled condition was what really caused the fall. However, plaintiff's testimony was that he could readily negotiate even the rain-wet terrazzo of Canal street by shortening his stride. Thus, had he been warned of the recent mopping, he could have avoided injury by taking shorter steps. We believe the conclusion proper that it was the lack of a warning, rather than plaintiff's disability, which caused the fall.
Defendants pleaded it was contributory negligence on plaintiff's part to attempt to walk through the hallway unassisted with his pupils dilated and his vision therefore blurred. But, since the evidence indicates there was no puddle or accumulation of water arguably visible to ordinary eyesight, we believe the record would not *492 justify a conclusion that plaintiff's blurred vision contributed to his fall even if we were to consider his action otherwise imprudent.
On quantum, all defendants seek reduction while plaintiff seeks an increase in the $30,000.00 award for "pain, suffering and disability".
The immediate injury was the breaking of plaintiff's kneecap into several fragments. The orthopedic surgeon testified that when he first saw plaintiff the knee was swollen and "extremely painful". The several kneecap fragments were removed and appropriate repairs were made to the extensor mechanism in surgery lasting an hour and ten minutes. The leg was placed in a cast up to the hip. Plaintiff remained in the hospital about ten days, and in bed at home for about six weeks, during which time the cast remained. The surgeon saw plaintiff regularly over a period of some ten months. In the seventh month after the accident, a grating and snapping sensation on motion of the knee could be felt and heard, due, in the surgeon's opinion, to operative scar tissue over the knee. Plaintiff complained of pain and weakness in using stairs, which the surgeon said was consistent with his condition. When the surgeon last saw plaintiff, ten months after the injury, "there was some pain", and the leg did not feel as strong as before the injury. The surgeon stated it was understandable why plaintiff suffered residual disability "more than another person with two legs because this one leg had to do all the work, so to speak."
The treating surgeon estimated, on the basis of pain, the patient's age, chances of returning to his occupation or rehabilitation for another occupation, "a great deal of things we take into consideration", that plaintiff had suffered approximately 20% residual disability. The disability consists in greater difficulty in walking, and particularly in using stairs, as well as difficulty in sitting down and getting up unassisted.
Plaintiff's occupation was watch and clock repairing. While much of this work is done sitting down, plaintiff testified that he would often have to move from a sitting position, and that clock repairs required working while standing, which he was much less able to do now that he must use two crutches instead of one. The treating surgeon thought plaintiff could return to his work, but had observed plaintiff seemed to have less balance than one would ordinarily have.
Another orthopedic specialist testified plaintiff could not extend his leg completely against resistance, and experienced pain associated with a sensation of weakness and giving away, at a range of 65 to 80 degrees flexion. This expert testified he found objective symptoms of plaintiff's complaints, and that inability to go up and down stairs was consistent with his examination of plaintiff. He described the use of a single crutch by a high amputee like plaintiff, hanging the leg stub in the hand hold, affording greater utility of the hands. He estimated plaintiff had a deficit of 15 to 20 percent of his leg, noting the greater importance of this deficit to a person with only one leg.
Plaintiff claims his disability deprives him of the possibility of employment, and asks for lost wages during his work life expectancy of seven years, totalling about $45,000. He complains of disability both to perform his work as before, and to get to and from work because of inability to climb into a bus. From his testimony, it would appear he is very distressed about his lack of work (although he did not seek employment in all former places of employment) and failure to support himself and his wife. He and his wife both testified that he had not worked from the January 1966 accident through the March 1968 trial date. His income tax returns for the two years prior to the accident supported their testimony that he had worked regularly prior to the accident. In the special damages award, the trial judge properly *493 limited recovery in full for lost earnings to the ten months of treatment.
The testimony of the treating surgeon indicates that, in spite of his disability, plaintiff ought to be able to work at his lifelong trade, and thus plaintiff has not proven total loss of future wages. The evidence does fairly indicate some disability which will affect plaintiff's future earnings, however, and in spite of the lack of any mathematical basis for evaluation, plaintiff is entitled to compensation therefor; Kezerle v. Hardware Mut. Cas. Co., 198 So.2d 119 (La.App.1967). We construe the $30,000.00 award for "pain, suffering and disability" to include such reduction of earnings as may result from residual disability.
Under all of the circumstances, we cannot say the trial judge abused his discretion as to quantum. We believe the award is neither manifestly inadequate nor manifestly excessive.
There remains the question of the third-party demand of Gentilly and its insurer against Safeway and its insurer. Safeway's printed form contract stipulated it "will maintain" liability insurance coverage for property damage or personal injury caused as a result of its performance under the contract. It is of no benefit to Gentilly that Safeway is obliged to have insurance unless the insurance will protect Gentilly. In our opinion the contract obliged Safeway to indemnify Gentilly, through insurance, against liability for personal injury resulting from Safeway's operations.
The judgment appealed from is accordingly affirmed.
Affirmed.
We granted rehearing limited to the questions of the liability of Gentilly and its insurer and their right to indemnity against Safeway and its insurer.
Gentilly points out we erred in saying it knew mopping was being done by Safeway between six and ten p. m. The contract calls for mopping weekly, and there is no direct evidence that Gentilly knew mopping was in fact being done nightly. We conclude this circumstance does not affect the result.
If the contract had specified mopping only when the building was not open, we might have considered Safeway's mopping in violation of such a provision in the same category as the act of a stranger leaving a slippery substance on the floor. The building owner's liability would then depend on a showing of actual or constructive notice of the floor's condition. But here Gentilly required Safeway to mop and knew mopping was to be done at some time, even if only once a week; it knew or should have known that even careful mopping would leave moisture on the floor for at least a brief period; and thus it knew that at some time during each week the hallway it provided for access to its tenant's offices would present a potential danger. It could have eliminated the danger by requiring the mopping to be done when the building was closed, or it could have provided warning of the danger; we believe that it was Gentilly's duty to do one or the other, as part of its duty towards persons impliedly invited on to the premises to keep the premises in a reasonably safe condition or warn invitees of known perils.
Gentilly again argues non-liability for the acts of its independent contractor. We do not hold Gentilly for Safeway's negligence, but for its own breach of duty towards invitees. We consider inapplicable the cases Gentilly cites, such as Landry v. News-Star-World Pub. Corp., 46 So.2d 140 (La.App.1950). There a building owner was held not liable to a passerby injured when part of an independent contractor's scaffold fell. The owner was held not to have breached any "direct responsibility" towards plaintiff. We suggest LSA-C.C. art. 670 as an example of direct responsibility of a building owner towards passersby *494 by to keep his building in repair; and we think that an owner who contracted with an independent contractor to maintain the building could not by an "independent contractor" defense escape liability to a passerby injured by the fall of part of the building. The duty remains that of the owner in spite of the contract.
In like manner here, we believe Gentilly had the direct responsibility towards its invitees to keep reasonably safe premises or warn of known potential danger, and its contract with Safeway did not relieve it of that duty. It is liable for plaintiff's damages resulting from its breach of that duty.
We said in our original opinion that the contract here obliged Safeway "to indemnify Gentilly, through insurance". This view, in any case, does not justify holding both Safeway and its insurer.
At most, Safeway obliged itself to provide insurance to protect Gentilly against liability for "injury caused as a result of" Safeway's performance of the contract. If Safeway did not provide such insurance, it would be liable to Gentilly because of the breach of a contractual obligation to provide insurance. If Safeway did provide the insurance, it would not be liable on that contractual basis because it would have already fulfilled the contractual obligation. Thus in affirming judgment over against both Safeway and its insurer, we erred in basing our conclusion on a contractual provision which at most bound Safeway alone, to provide an insurer who would (if provided) be liable alone.
Several articles from our Civil Code are pertinent.
LSA-C.C. arts. 2091 and 2092 provide:
"There is an obligation in solido on the part of the debtors, when they are all obliged to the same thing, so that each may be compelled for the whole, and when the payment which is made by one of them, exonerates the others toward the creditor."
"The obligation may be in solido, although one of the debtors be obliged differently from the other to the payment of one and the same thing; * *."
We do not enter the theoretical discussion of whether joint tort-feasors' liability is "in solidum" rather than "in solido"; see La.Law Inst. translations, Planiol Civil Law Treatise, II, 777-9 and 900-905; Aubry & Rau, Obligations § 298b, especially note 6; see also Litvinoff, Louisiana Civil Law Treatise, note 70, p. 41. The criteria of LSA-C.C. arts. 2091 and 2092 are present in the joint tort-feasors' obligations (at least after judgment, if only "imperfect" solidarity exists before); Quatray v. Wicker, 178 La. 289, 151 So. 208 (1933). For further theoretical discussion of solidary liability in unintentional tort, see Toullier, Droit Civil Francais, v. 11, t. IV, ch. 2, §§ 151ff. (1830), trans. Miller, ed. Polack, at 16 La.Bar J. 147, 362 and 17 La.Bar J. 47 (1969); see also Cline v. Crescent City R. Co., 41 La.Ann. 1031, 6 So. 851, 854 (1889).
LSA-C.C. art. 2104 states the general rule of contribution among solidary coobligors: "If one of the codebtors in solido pays the whole debt, he can claim from the others no more than the part and portion of each. * * *" But, art. 2106 declares,
"If the affair for which the debt has been contracted in solido, concern only one of the coobligors in solido, that one is liable for the whole debt towards the other codebtors, who, with regard to him, are considered only as his securities."
Conversely, in the suretyship title of the Code, in a section dealing with the effects of suretyship between creditor and surety, art. 3045 declares the surety's entitlement to the benefit of discussion of the debtor's property,
"* * * unless the security should have renounced the plea of discussion, or should be bound in solido jointly with *495 the debtor, in which case the effects of his engagement are to be regulated by the same principles which have been established for debtors in solido."

The following code section, on suretyship's effects between debtor and surety, provides to the surety who has paid the debt a remedy against the real debtor for principal, interest and costs, LSA-C.C. art. 3052, and describes this remedy in art. 3053 as "the same right of action and the same privilege of subrogation, which the law grants to codebtors in solido". That section further provides, in art. 3057,
"A surety may, even before making any payment, bring suit against the debtor to be indemnified by him:
1. When there exists a lawsuit against him for payment.

* * * * * *
Using these articles in pari materia, LSA-C.C. art. 17, in an effort to decide equitably, art. 21, in a pure respondeat superior tort case, where master and servant are liable in solido under the tests of arts. 2091, 2092, it could be argued that, in the words of art. 2106, the affair "concerns" only the servant, in the sense that as between him and the master only the servant committed the offense or quasi-offense from which the solidary obligation arose and the master's responsibility is for the servant's fault. Thus "that one [the servant] is liable for the whole debt towards the other codebtors, who, with regard to him, are considered only as his securities." As between creditor and surety ("security"), the surety is governed by principles applicable to debtors in solido, art. 3045; but as between debtor and surety, the surety (the master) has the right (1) to subrogation to the creditor's right against the debtor (servant) if the surety (master) has paid the debt, arts. 3052, 3053; and (2) to indemnity against the debtor (servant) if the surety (master) has not paid the debt but suit has been filed against him. This right of indemnity may be the right to have judgment in the amount of the debt against the real debtor, with the proceeds realized thereon payable to the real creditor; Mudd v. Rogers, 10 La.Ann. 648 (1855). Today, if suit has been filed against the surety, this indemnity may be granted on third-party demand under LSA-C.C.P. art. 1111.
The key to the applicability of the codal principle of indemnity is of course the determination that the affair "concerns" only one of two or more solidarily liable parties within the meaning of LSA-C.C. art. 2106 and therefore, as between themselves, the other or others are only the sureties of that one. Otherwise, the general rule of contribution only, art. 2104, must be applied.
The question whether the affair concerns only one of the solidary codebtors in the sense of art. 2106 is, under tort circumstances, the same as the question whether one's negligence was actual and the other's only constructive, in which case tort indemnity is owed by the one to the other, Appalachian Corp. v. Brooklyn Cooperage Co., 151 La. 41, 91 So. 539 (1922); and it is the same as the key question in an action de in rem verso, namely whether some basis exists to conclude that treating both codebtors as equally responsible (as between themselves) would constitute an unjust enrichment of one at the expense of the other (to the extent that the one, on that basis, should bear all the damages, yet by contribution would bear only half, at the expense of the other), see Minyard v. Curtis Products, Inc., 251 La. 624, 205 So.2d 422 (1967). Discussions of Minyard and the action de in rem verso at 14 Loyola L.Rev. 434 (1968) and 43 Tulane L.Rev. 263 (1969) have been very helpful in approaching our problem here. We might also note the mutual exclusiveness of contribution and indemnity as a possible source of help in evaluating a conclusion: to deny indemnity to one is to hold the other entitled to contribution. If Safeway were suing Gentilly for contribution, whether we deny contribution should depend on the *496 factors governing whether we would grant Gentilly indemnity.
It appears to us that no matter how the question is phrased we must come ultimately to a delictual or contractual resolution: we must say either that the one's negligence caused injury to the other (who was only liable on theoretical grounds for damage actually inflicted by the one); or, that the one by contract agreed that he alone would be responsible. If we can say neither, then the general rule of contribution must be applied.
On the question whether one's negligence is the cause of the other's liability, the question is relevant whether one owed the breached duty to the other (and not only to the injured third party). Thus in Appalachian, plaintiff owed a duty to the plaintiff watchman (whether as his employer or as building owner) to provide safe premises, but it did not owe this duty to defendant, its vendor who was in fact still in possession of the premises. Likewise here, Gentilly had no obligation towards Safeway to warn third persons of the danger here involved: thus Safeway, if sued alone, should not have been able to ask for indemnity or even contribution from Gentilly because Gentilly did Safeway no wrong, breached no obligation owed to Safeway.
Safeway, on the other hand, was obliged towards Gentilly, impliedly, to so perform its contract as not to expose Gentilly to liability to third persons (even pretermitting Safeway's promise of insurance against liability). Safeway was obliged towards Gentilly to warn third persons of damp floors resulting from its mopping. As between Gentilly and Safeway, it cannot be said Gentilly owed any duty to Safeway to warn third persons of Safeway's activity: as between Gentilly and Safeway, this was exclusively Safeway's duty, and Safeway's breach of duty was alone responsible for plaintiff's injury. As between Gentilly and Safeway, the affair out of which their solidary liability arose concerned only Safeway, and Gentilly was only its surety, entitled to indemnity against it for its negligence, and against its negligence insurer which was also cast in solido. Gentilly's insurer, because of its subrogation to Gentilly's rights, is entitled to the same judgment over.
We now fully reinstate our prior decree, and the judgment appealed from is in all respects affirmed.
Prior decree reinstated.
CHASEZ, J., concurs in the result and decree.