**HOUSTON–NEW ORLEANS, INC., Plaintiff,**

v.

**PAGE ENGINEERING COMPANY, and Creole Electric Services, Inc., Defendants.**

**Civ. A. No. 67–1819.**

United States District Court,
E. D. Louisiana.
Nov. 14, 1972.

Harry S. Redmon, Jr., New Orleans, La., for plaintiff.

Frank C. Allen, Jr., New Orleans, La., for defendant Page Engineering Co.

David C. Treen, New Orleans, La., for defendant Creole Electric Services, Inc.

ALVIN B. RUBIN, District Judge:

This is a suit by the owner of a barge against the supplier of equipment and against the repairman who installed it, both on a theory of negligence and for breach of warranty. Shortly after a new control panel was installed in a crane mounted on a barge, the VELMO–R, in May, 1967, the boom of the crane struck one of the spuds on the barge and caused extensive damage. Houston-New Orleans, Inc. (HNO), the owner of the dragline barge, had ordered the control panel from Page Engineering Co. (Page). Creole Electric Service (Creole) had installed it. HNO contends the damage resulted from defects in the panel supplied by Page and negligence in its installation by Creole. The defendants each contend the operator of the dragline was at fault and that HNO was at fault for operating it; and, alternatively, that the damage resulted from the fault of the other defendant.

The trial was repeatedly delayed, the facts have become hazy, the issues are complicated, the briefs are long. But, considered and reconsidered, the evidence now available points to the conclusion that the negligence of all three of the parties contributed to cause the damage, and, as such, damages ought to be shared under the principle of comparative negligence.

## I—FACTS

### A. UNCONTESTED FACTS

This much is uncontested. In February, 1967, the VELMO–R had a collision with another vessel. The dragline mounted on the barge was damaged, and it was necessary to replace its control panel. HNO ordered a new panel from Page. Meanwhile, it continued to operate the dragline with the original control panel (as repaired by Creole) aboard the barge, which was afloat in navigable waters. In May, HNO received the new control panel in New Orleans, shipped it to a borrow bit on the East Atchafalaya Levee System, near Bayou Sorrel, Louisiana, took the barge off its job, and floated it to the pit. Creole's employees came there to install the new panel on Friday, May 26, 1967.

After Creole had installed the panel, it could not obtain the electrical test results required by Page's specifications. The machine operators tested the machine and complained that it was sluggish in its swinging operation. In other words, the boom operated more slowly than the operators were accustomed to, and responded more slowly to a change of direction than it should have.

### B. CONTROVERTED FACTS

At this point, accounts begin to conflict. I conclude however that the events were as follows: Creole's electrician reported to HNO that there was a problem in connection with the control panel that he could not identify, the machine was sluggish, and it was necessary to be careful in its operation, but that it was operational and could be restored to duty. So the barge was floated back to its work site and operations were resumed.

The next day Creole's superintendent checked the control panel, and reported to HNO's President. He stated that he still could not reach proper test results, but he did not at any time suggest that this made it advisable to take the machine out of service. Creole, who had worked on the dragline before and rendered other services to HNO as a regular customer, knew that the machine was usually operated 24 hours a day and that there was a great loss of revenue when it was out of service, and was doubtless reluctant to take the firm stand that later events indicated would have been desirable, but Creole's superintendent did caution the operators to be careful.

The boom on the dragline is controlled by electrical action, and stopped

by reverse electrical action; this first retards the swing then brings it to a stop. The resistors in the control panel govern the electrical current that causes reversal of the swing. Since they were not adequate when first installed, the machine functioned improperly. Sometime later it was discovered that Page had equipped the control panel with an improper set of resistors, and that this caused the sluggishness in the boom's swing.

A short time after the call from Creole's superintendent, the dragline boom hit the barge's spud. The boom was damaged, and the crane was taken out of operation for repair. The old resistor bank was reinstalled, and the dragline worked properly. Thereafter Page supplied a new (and properly sized) resistor bank, it was installed by Creole, the readings required by the manufacturer's specifications were reached, and the dragline has since operated uneventfully.

## C. FURTHER FACT FINDINGS AND FACTUAL CONCLUSIONS

A preponderance of the evidence supports the following findings:

Because the resistors first supplied with the control panel were the wrong size, they could not be adjusted to reach specifications. This should have caused the electrician to suspect that the resistors supplied were not the correct ones. In addition, it would have been evident from visual examination by an electrician familiar with the old panel, as Creole's employees were, that the resistors in the new panel were smaller than the ones that had been used before, and hence that they were possibly wrong. That fact could also have been discovered by comparing the serial numbers on the two sets of resistors. None of these observations were made, and the fact that improper resistors had been supplied was discovered only after the harm was done. Although Creole's employees cautioned the dragline operators to be careful, they never recommended that the machine be kept idle, and, indeed, watched it in operation without suggesting that its return to service be delayed.

## II. THE CAUSE OF THE CASUALTY

A moment before the damage occurred the dragline boom was in motion. The operator (who had replaced the operator present when Creole's employees were on the site) took the steps to stop its swing, but perceived that it was not stopping properly. He immediately dropped the dragline bucket into the water to retard the boom's swing and avoid the damage that might occur if the bucket itself continued to swing. Had the controls been operating properly the boom would have stopped. The crash was not the result of operational error but of the defective control panel. There is some evidence that his supervisor had not warned this operator to be careful, but he was aware of the sluggish operation and hence knew all that his supervisor did with respect to the operational problem.

The evidence does not demonstrate the precise nature of the defect in the control panel caused the casualty. But had there been a proper resistor bank it would not have occurred.

Judgment in law suits is not based on scientific certainty. It is based on a preponderance of the evidence. By that test operational fault is eliminated. The operator was a credible and convincing witness. He testified that the boom did not stop when he reversed, he dropped the bucket, the boom continued to travel, and struck the spud.

The post accident photographs can be interpreted in various ways—witness the elaborate geometry of the opposing briefs, each based on different supposed arcs and each purportedly demonstrating with the certainty of Euclidean proof of a geometric theorem that the event occurred in only one way, each of course different. But in my view the photographs tend to support the operator's testimony.

■■ That being so, then the fault must have been in the control panel. This is supported to some degree by Prof. Webb's testimony. The exact nature of the defect was not shown. But

the purchaser of a manufactured article that fails in normal use is not required to point out the specific defect so long as the facts demonstrate that some fault in the article was responsible. Indeed, a defect can be inferred from unexplained occurrences. Franks v. National Dairy Products Corp., 5 Cir. 1969, 414 F.2d 682.[1] Here there was a specific, identifiable defect, the improper resistor bank. What is not fully explained is the mechanism by which this occasioned the event.

■ The dragline had operated perfectly with the old control panel containing the right sized resistors. After the casualty it operated perfectly when the old resistors were re-installed temporarily. And after the new resistors arrived it operated perfectly. Only during the 22 hours that the new control panel was in place did the machine exhibit any difficulties. Never before had similar problems arisen and never afterward did these problems recur. Hence, a preponderance of the evidence points to Page's fault in supplying a control panel with an improper resistor bank as a proximate cause of the damage.[2] It is not necessary for HNO to go beyond this and demonstrate the exact mechanism of

the failure.[3] Kridler v. Ford Motor Company, 3 Cir. 1970, 422 F.2d 1182;[4] Weber v. Fidelity and Casualty Insurance Company of New York, 1971, 259 La. 599, 250 So.2d 754; Jordan v. Travelers Insurance Company, 1971, 257 La. 995, 245 So.2d 151, 155; Naquin v. Marquette Casualty Company, 1963, 244 La. 569, 153 So.2d 395; Perkins v. Texas and New Orleans Railroad Company, 1962, 243 La. 829, 147 So.2d 646; Ferina v. United Paper Company, La.App. 1971, 252 So.2d 542; and Metrailer v. F and G Merchandising, Inc., La.App.1970, 230 So.2d 395.

■ As stated by the Louisiana Supreme Court in Jordan, supra, 245 So.2d at 155:

[P]roof need be only by a preponderance of the evidence, not by some artificially created greater standard. This burden of proof may be met by either direct or circumstantial evidence . . . . Whatever the descriptive term used, however, proof by direct or circumstantial evidence is sufficient to constitute a preponderance, when, taking the evidence as a whole, such proof shows that the fact or causation sought to be proved is more probable than not.

---

1. In Franks, the Court of Appeal approvingly quoted the lower court's statement, after it had negated several possible external causes of the accident: "The only explanation for the explosion which injured plaintiff is that there was some defective condition in the product itself. This is the only inference which is reasonable under the circumstances." 414 F.2d at 685. To reach this conclusion, the district court was required to disregard the testimony of the defendant's expert witness. "The trial court was not bound to accept the opinion of the expert witness but, rather, had a right to use his own common sense and experience and to draw all reasonable inferences from the physical facts and occurrences." Id. at 685. This decision, based upon Texas law, is of course, only persuasive.

2. M. P. Lovaas, Page's chief engineer, was presented with these facts as a hypothetical question by plaintiff's counsel: "Is it not reasonable to presume that the condition of the resistors or the adjustment of

the resistors was the cause of the boom swinging into the spud?" He responded: "Yes" (pp. 84–86 of his deposition).

3. Cf. Borowicz v. Chicago Mastic Co., 7th Cir. 1966, 367 F.2d 751, where there was no evidence whatsoever of fault by the defendant, and conversely, the evidence pointed to fault by the plaintiffs.

4. In Kridler, the court in applying Pennsylvania law quoted from Smith v. Bell Telephone Co., 1959, 397 Pa. 134, 138, 153 A.2d 477, 479–480. A case may go to the jury if "the evidence presented [is] such that by reasoning from it, without resort to prejudice or guess, a jury can reach the conclusion sought by plaintiff, and not that that conclusion must be the only one which logically can be reached. It is not necessary . . . that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability . . . . "

Several years before *Jordan* that court also stated:

> Causation may, of course, be proved by circumstantial evidence. In many instances, it can be proved only by such evidence. Taken as a whole, circumstantial evidence must exclude other reasonable hypotheses with a fair amount of certainty. This does not mean, however, that it must negate all other possible causes.

Naquin v. Marquette Casualty Company, 1963, 244 La. 569, 153 So.2d 395, 397. Other possible causes of an accident which are "remote, conjectural and speculative . . . as a possible cause in fact" may be disregarded. Metrailer v. F & G Merchandising, Inc., La.App. 1969, 230 So.2d 395, 400.

## III.  CREOLE'S NEGLIGENCE

■ Creole negligently failed to discover that the control panel was equipped with improper resistors. It could and should have done so. Failing this, it should have warned HNO of the danger of failure and suggested that the machine be kept out of operation until the problem could be corrected.

Creole contends it warned HNO. But a preponderance of the evidence satisfies me that it merely told HNO that it could not obtain proper test results and, in addition, what HNO's own operators knew: the machine was sluggish. Weighing the testimony of the witnesses and judging their credibility, I accept the testimony that Creole informed HNO that the machine was "operational" albeit torpid, and that Creole gave no warning that continued use was dangerous.[5]

HNO relied upon Creole's expertness in installing and testing the unit. As to Creole's services, HNO was in the position of the consumer who relies on a professional with superior knowledge and judgment, such as the serviceman who has repaired his auto or his electrical appliance, to tell him whether or not the repaired item may safely be used. Creole should have appreciated the hazard, it failed both in its duty to detect the danger and in its duty to warn HNO. Foy v. Ed Taussig, Inc., La.App. 1969, 220 So.2d 229, 239. Cf. Ryan Stevedoring Co. v. Pan-Atlantic Steamship Corp., 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133.

Though Page breached its warranty in supplying an improper panel, Creole was negligent in installing it. When Creole failed to achieve proper test results, it should have determined that the resistors were improper and replaced them with the old resistors. Or it should at least have warned HNO not to operate the dragline until the problem could be discovered and corrected.

## IV.  WAS HNO CONTRIBUTORILY NEGLIGENT?

■ Page in effect asserts that, although it sold HNO an admittedly defective item, HNO should have learned there was something wrong and kept the item out of use. Creole asserts that, although it failed to find out the cause of its inability to secure proper test results, and did not appreciate the operational hazard, HNO should have been more aware of the peril and should have kept the dragline idle.

There is an element of truth in each charge. The existence of a legal duty on the part of Creole, to discover the defect and adequately warn HNO of the real dangers of operation, does not preclude a legal duty on the part of HNO to cease operation until more specific factual information could be determined. The factual circumstances of which HNO was aware imposed upon them a duty to do more than they did. HNO did know that there was a problem in operating

---

5. But compare the testimony of Mr. John Flores, Creole's general manager at the trial: Q: "Weren't you aware of the fact that one of the dangers with operating the machine in its sluggish condition was that it might have hit a spud or the bucket could have hit a structure on the boom could have hit the spud." A: "That's right." (R pp. 194–195.)

the machine, and that this required unusual care on the part of the operator. The most efficient use of the machine requires a rhythm of operation and the fact that the sluggishness of the machine might impair that rhythm should have been known to HNO.

There is evidence that, on the evening previous to the accident here, a similar power failure occurred. Mr. D'Arbonne testified that, on that occasion, the boom failed to stop and he stopped its swing by dropping the bucket in the water. He also testified, without objection, that a third party there at the time of this first power failure had seen sparks flying from the cubicle. (R. 77, 78, 80) and (PAGE exhibit 7, pp. 34–36).

Under these circumstances HNO should have been alerted to the dangers of operation, and HNO should have awaited further communication with Page and Creole. To continue operation in the light of these circumstances constituted negligence that contributed to the cause of the accident.

These findings are to some degree inconsistent with my oral conclusions at the end of the hearing. It may be that, to use an old poker player's axiom, "study long means study wrong." But they represent my best deliberate judgment after careful reconsideration of the testimony and lengthy post-trial briefs and supplementary briefs in response to questions directed to counsel by the court after hearing the evidence.[6]

## V. THE CROSS CLAIM

Indemnity here is inappropriate. Creole is more than passively or vicariously responsible. Its employees' failure to discover the nature of the defect, and their failure adequately to warn HNO places Creole in a different position from that of a party who is not in any way guilty of actual fault and is found only technically responsible for the negligent act of the indemnitor. Tri-State Oil Tool v. Delta Marine, 5th Cir. 1969, 410 F.2d 178; General Electric v. Cuban American, 5th Cir. 1968, 396 F.2d 89.[7] Truxillo v. Gentilly Medical Bldg., Inc., La.App.1969, 225 So.2d 488, at 495–496. Creole's position was not simply the position of one who installs equipment defectively manufactured by another; here it was in the position of an expert upon whom HNO relied, and who represented that the operations could continue with caution.

## VI. APPLICABLE LAW: ADMIRALTY

### A. CREOLE

The contract between HNO and Creole was to make repairs to equipment aboard a vessel in navigation.[8]

6. See the court's minute entry of May 11, 1972 directing questions to all counsel.

7. In *General Electric,* the Court in interpreting Louisiana law stated that for non-contractual tort indemnity to exist there must be a "complete absence of actual negligence, that is, where one party is clearly only technically at fault or vicariously liable." See also Truxillo v. Gentilly Medical Building, Inc., La.App.1969, 225 So. 2d 488 where the court held that indemnity would be required only where one party owes a duty to the other not to expose him to liability, that is, where one party may be vicariously liable for the negligence of the other. (*Id.* at pp. 494–496).

8. In J. C. Penny v. McArdle, 5th Cir. 1928, 27 F.2d 324, the court held that a dredge, not dredging a channel, but rather creating a *beach,* was not engaged in a maritime purpose, thus no admiralty jurisdiction. A like conclusion was reached with respect to a dredge used to gather gravel for sale on shore. Johnson v. Dredge, D.Md.1965, 241 F.Supp. 598. Forty years later in Miami River Boat Yard v. 60' Houseboat Special, 5th Cir. 1968, 390 F.2d 596, Judge Brown strictly limited *McArdle* to its facts: "A floating hydraulic dredge being used to make land, not create, improve, or maintain a navigable waterway." at 597. In *Miami,* the court held that a powerless houseboat was a "vessel" within admiralty jurisdiction—citing 1 USCA 3. Note that five years after *McArdle,* in Self v. Central Station, 5th Cir. 1933, 65 F.2d 789, a powerless barge to which repairs were made, was within admiralty jurisdiction even though the barge was "laid up" at

This was a maritime contract. North Pacific Steamship Company v. Hall Brothers Railway & Shipbuilding Co., 1919, 249 U.S. 119, 39 S.Ct. 221, 63 L. Ed. 510;[9] Alcoa Steamship Co. v. Charles Ferran & Co., 5 Cir. 1967, 383 F.2d 46; Sicula Oceanica, S. A. v. Wilmar Marine Eng. & Sales Corp., 5 Cir. 1969, 413 F.2d 1332; Gilmore & Black, The Law of Admiralty, 21 (1957).

Those who repair a vessel or the equipment aboard it make a warranty, the implied warranty of workmanlike performance.[10] Alcoa Steamship Co. v. Charles Ferran & Company, 5 Cir. 1967, 383 F.2d 46; Sicula Oceanica, S. A. v. Wilmar Marine Eng. & Sales Corp., 5 Cir. 1969, 413 F.2d 1332.[11] The rule is set forth succinctly in Alcoa, *supra*:

"It is well settled that a contract to repair a vessel is maritime . . . . Consequently, a shipowner has a maritime cause of action whether he sues in contract for a breach of warranty of workmanlike service or in tort for the negligent performance of a maritime contract . . . . Federal law governs the construction of the terms of the repair contract, . . . and would also appear to govern the standard of performance due under the contract . . . ."

For the reasons set forth above, Creole did not perform its work in a workmanlike manner. It failed to notice that the resistors were improper and it failed to give an adequate warning. Both of these would have been done had the service been workmanlike. Hence, HNO was much like the patient whose doctor says "your blood pressure is 170/90." The patient needs to know the significance of this observation.

Thus, HNO is also entitled to judgment on the ground of breach of warranty as well as for negligence; both for Creole's failure to discover the defect and for their failure to warn.

### B. PAGE

The HNO–Page contract is also a maritime one. The HNO–Page contract called for Page to fabricate the console for the dragline aboard the VELMO–R. Page had serviced the dragline aboard the VELMO–R since the vessel was purchased by Houston; it was aware of the collision damages sustained in February, 1967; it knew the console would be installed aboard the VELMO–R.

Contracts to furnish supplies or accessories to a particular vessel are maritime in nature[12] even though the

---

time of the repairs. Though the barge had a piledriver attached, for use in constructing a bridge, the court held those facts irrelevant." The repairs [to the boilers of the barge] were for the benefit of the vessel." Here the barge was afloat in navigable waters and being used to construct part of a levee system. It was floated to its work site through navigable waters, in tow of a river tug, and later floated away, in the tow of such a tug. The barge had the capacity to move under its own power, though not by propeller. The operator could throw out the bucket, which acted as an anchor, then lift the spuds and pull itself to a new location.

9. The court there stated: "[I]n matter[s] of contract [jurisdiction] depends upon the subject-matter [and] the nature and character of the contract, . . . the true criterion being the nature of the contract, as to whether it have reference to

maritime service or maritime transactions." 39 S.Ct. at 223.

10. A similar warranty for repairs exists under Louisiana law. Rotolo v. Stewart, La.App.1961, 127 So.2d 24.

11. *Cf.* Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 1956, 350 U.S. 124, 133–134, 76 S.Ct. 232, 237, 100 L.Ed. 133. Where the court discussed the obligation of a stevedore. "It is [the stevedore's] warranty of workmanlike service that is comparable to a manufacturer's warranty of the soundness of its manufactured products."

12. *Cf.* Capital Transportation Corp. v. J. C. Thelning, EDSC 1958, 167 F. Supp. 379, where a machinery company, providing bearings, had no knowledge that these parts were to be used in connection with a maritime contract. Cf. also The Defiance, E.D.N.C., 1924, 3 F.2d 48 holding

supplier does not himself incorporate the product into the ship. The Hiram R. Dixon, EDNY 1887, 33 F. 297; Reed v. Weule, 9 Cir. 1910, 176 F. 660; Linen Thread Company v. Shaw, 1 Cir. 1925, 9 F.2d 17, 1926 A.M.C. 67; Compania Argentina De Nav. D. v. Atlas Maritime Corp., S.D.N.Y.1956, 144 F.Supp. 13, 1957 A.M.C. 100; Martran Steamship Co. v. Aegean Tankers, Ltd., S.D.N.Y. 1959, 170 F.Supp. 477; Gilmore & Black, The Law of Admiralty, 21 (1957). The locality of initial performance of the contract is not determinative.

■■■■■ Even were the contract not a basis for admiralty jurisdiction, jurisdiction would still lie in tort. "Although unknown to admiralty until relatively recent times, a products liability action predicated upon the manufacturer's negligence undoubtedly will now lie in admiralty." In re Alamo Transportation Co., S.D.Tex.1970, 320 F.Supp. 631.[13] Middleton v. United Aircraft Corp., S.D. N.Y.1960, 204 F.Supp. 856, 859; Soileau v. Nicklos Drilling Co., W.D.La. 1969, 302 F.Supp. 119; Schaeffer v. Michigan Ohio-Nav. Co., 6th Cir. 1969, 416 F.2d 217. Sevits v. McKiernan-Terry Corp., S.D.N.Y.1966, 264 F.Supp. 810. This doctrine was engrafted from existing state law. As stated in Littlehale v. E. I. du Pont de Nemours & Co., S.D.N.Y. 1966, 268 F.Supp. 791, 797:

"[A]dmiralty judges often look to the law prevailing on the land. * * * If the 'law prevailing on the land' recognized such a claim 'uniformly or nearly so, a United States admiralty court would approach the problem here by asking itself why it should not likewise do so; * * *.' "

that no maritime lien was created where an engine was sold on the basis of the owner's credit only, and was delivered to the owner at a point distant from the ship. See also In re Alamo Transportation Co., SD Tex.1970, 320 F.Supp. 631.

13. The distinction between *Alamo* and the present case is that there jurisdiction existed only in tort, but not in contract, whereas here it exists in both.

And, as stated in Schaeffer v. Michigan-Ohio Navigation Co., 6th Cir. 1969, 416 F.2d 217, at 221 "[A]dmiralty law (albeit slowly) draws upon and incorporates the law prevailing on land where there is no historic (or statutory) principle to the contrary." And, for a products liability action, "the locale of the occurrence is jurisdictionally dispositive." *Alamo, supra,* 320 F.Supp. at 634.[14]

■■■■ The protection of the doctrine of products liability does not extend to personal injuries alone. W. Prosser, the Law of Torts § 101 at 665–66 (4th ed. 1971) remarks:

"There can be no doubt that the seller's liability for negligence covers any kind of physical harm, including not only personal injuries, but also property damage to the defective chattel itself; . . . as well as damage to any other property in the vicinity . . . . With the extension of strict liability beyond food . . . there is now general agreement that there may be recovery not only for damage to the defective chattel itself, or to other products made from it, but also to other property in the vicinity."

Note that the Restatement of Torts 2d § 402A, which incorporates the rule of strict products liability, includes responsibility for damage to "the ultimate user or consumer, or to his *property* . . . ." [15]

■■■■ An action in tort for supplying a defective product exists not only on the basis of strict products liability but also for negligence. In Watz v. Zapata Off-Shore Co., 5th Cir. 1970, 431 F.2d 100, the court held the manufacturer of

14. It is the place where the injury occurs that is determinative, not the place where the wrongful act or omission had its inception. Watz v. Zapata Off-Shore Co., 5th Cir. 1970, 431 F.2d 100, at 109.

15. Negligence in failing to discover a defect in a product, Restatement of Torts, 2d § 392, or negligent manufacture, Restatement of Torts 2d § 395, would also justify damages for "physical harm" caused by the defect.

a chain negligent for failure to adequately test the chain. A non-seaman was injured aboard a vessel when the chain broke and he was struck by a falling pipe. The court concluded that it had admiralty jurisdiction because the injury occurred on the water, even though the negligence of the manufacturer of the chain occurred at a distant point on land. It was held that, where a defect was shown, negligence may be inferred, and need not affirmatively be proved, because the defect "would not ordinarily occur in the absence of negligence." *Watz, supra,* at 119. This was not an application of *res ipsa loquitur,* but rather a conclusion that circumstantial evidence would suffice to prove negligence. *Id.* at 119. Because it found negligence, the court expressly reserved the issue of breach of the warranty of fitness.

 For these reasons, Page must be found to be liable both for its negligence and for breach of warranty.

## VII. COMPARATIVE NEGLIGENCE

This appears to be a classic situation for the application of the doctrine of comparative negligence. The fault of each party was a cause in fact, or as it is sometimes called a "but for" cause or *causa sine qua non,* of the damage. Beyond that, the fault of each party was a proximate cause of the damage. The collision of boom and spud was a foreseeable result of the provision of improper resistors (Page), of the failure to prevent resumption of operation when proper test results could not be obtained (Creole), and of continued operation in the light of a known, albeit perhaps underestimated, peril (HNO).

In admiralty the sensible doctrine applies that where all share in fault for the loss, all should share in bearing the economic burden. HNO's negligence merely mitigates damages; it does not bar the claim. Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143.

It is difficult to put a percentage tag on degrees of fault. The court recognizes that any such determination is in part arbitrary, in part based on intuition, and in part based on experience, all applied to the evidence adduced. Considering the evidence here, it is my conclusion that negligence contributed to the damage in the following proportions:

| | |
|---|---|
| Page | 50% |
| Creole | 30% |
| HNO | 20% |

Judgment accordingly. Counsel for plaintiff will prepare a form of judgment. Interest will be allowed from the date of the damage.